UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| MICHAEL W. DECKER, | ) | Case No. **17-50297** |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| W. STEPHEN SCOTT, TRUSTEE FOR | ) | |
| MICHAEL W. DECKER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary Proceeding No. |
| | ) | **19-05006** |
| MICHAEL W. DECKER | ) | |
| WINCHESTER ACCOUNTING, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## MOTION FOR SUMMARY JUDGMENT

W. Stephen Scott, Trustee for Michael W. Decker (the "Trustee") moves the Court for summary judgment against Defendant Michael W. Decker ("Decker"), pursuant to Federal Rule of Civil Procedure 56, and in support of the motion, states as follows:

### Basis and Standard for Relief

1.      Federal Rule of Civil Procedure 56 ("Rule 56") is made applicable to this proceeding pursuant to Federal Rule of Bankruptcy Procedure 7056. The standard for the grant of summary judgment is provided by Rule 56: "[t]he court may grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law".

1

## The Relief Requested in the Second Amended Complaint

2.      In his Second Amended Complaint [AP Docket No. 25], filed on January 28, 2020, the Trustee seeks the following relief:  (a) the avoidance of post-petition transfers of property of the estate to Decker pursuant to section 549(a)(1) of the Bankruptcy Code, (b) the avoidance of post-petition transfers of property of the estate to Winchester Accounting LLC pursuant to section 549(a)(1) of the Bankruptcy Code, (c) the recovery of any avoided transfers of property of the estate to Decker and/or Winchester Accounting pursuant to section 550(a) of the Bankruptcy Code, (d) money damages for conversion by Decker of property of the estate, (e) the disallowance of any claims arising from the Trustee's avoidance and recovery of post-petition transfers of the estate to Decker and/or Winchester Accounting, LLC, and (f) interest on the sum of the transfers avoided pursuant to section 544(a)(1) of the Bankruptcy Code and section 8.01-382 of the Code of Virginia (1950, as amended).

## The Decisive Issue for Summary Judgment

3.      As is more fully set forth below, in the Joint Stipulation and the documents attached thereto as Exhibits [collectively, AP Docket Nos. 33, 39 & 43] filed by the parties to this proceeding and in the record of the underlying Chapter 7 case in which this proceeding arises, of which the Trustee has requested that the Court take judicial notice, the date, the amount and the recipient of each transfer at issue in this proceeding is not in dispute.  The decisive issues are whether and to what extent each transfer was a transfer of the "proceeds, product, offspring, rents, or profits of or from property of the estate" and not "earnings from services performed by an individual debtor after the commencement of the case" excepted from property of the estate under section 541(a)(6) of the Bankruptcy Code, each transfer resulted in the diminution in the value of

2

the WAC stock that is property of the estate, and therefore whether and to what extent each transfer of property of the estate subject to avoidance and recovery by the Trustee.

### The Applicable Section of the Bankruptcy Code

4.      Section 541(a) of the Bankruptcy Code provides that the estate created upon the commencement of a case is comprised of "all legal and equitable interests of the debtor in property as of the commencement of the case" and "proceeds, product, offspring, rents, or profits of or from property of the estate, except as are earnings from services performed by an individual debtor after the commencement of the case" and "any interest in property that the estate acquires after the commencement of the case." 11 U.S.C. §§ 541(a)(1), (6), and (7).

### The Undisputed Relevant Facts

5.      Michael W. Decker (the "Debtor") filed a voluntary petition under Chapter 7 of the Bankruptcy Code on March 30, 2017 (the "Petition Date") in the United States Bankruptcy Court for the Western District of Virginia, Harrisonburg Division, commencing Case No. 17-50296 (the "Case") [Docket No. 1].

6.      Winchester Accounting and Consulting, Inc. ("WAC") is a Virginia stock corporation formed on January 13, 2015, and is validly existing under the laws of the Commonwealth of Virginia, and is taxed as an S-Corporation pursuant to Subchapter S of the Internal Revenue Code, 26 U.S.C. §§ 1361 *et seq.* [Stipulation ¶ 1].

7.      The Debtor was the sole shareholder, director, and officer of WAC during the period commencing on January 1, 2017, and at the time of Decker's commencement of the Case. [Stipulation, ¶ 2].   Pursuant to section 541(a) of the Bankruptcy Code, on the Petition Date, Mr. Decker's shares of WAC stock became property of the estate of the Case. [Stipulation, ¶ 3].

27571/1/9305165v1

8.     A true and complete copy of the 2016 Federal income tax return for WAC was attached to the Joint Stipulation as **Exhibit A** [Stipulation ¶ 4]. The WAC 2016 Federal income tax return (the "2016 Return") was prepared by Mr. Decker. [Stipulation ¶ 4]. On page 1 of Form 1120S of the 2016 Return, WAC disclosed that it had (a) Gross Income of $385,482.00 (line 1a), (b) paid compensation of its officers (which was the Debtor) of $90,000.00[1] (line 7), (c) paid other salary and wages of $41,833.00 (line 8), (d) paid $20,400.00 in rents (line 11), (e) paid $13,105.00 in taxes and licenses (line 12), (f) paid $167,139.00 in other deductions (line 19), which as reflected on Statement 1 of the return, consisted of computer expense, continuing education, credit card fees, dues & subscriptions, legal & professional expenses, meals & entertainment, office expense, parking & tolls, payroll service fees, postage, shredding, software, telephone, travel and website, (g) paid $3955.00 in pensions & profit sharing plans, and (h) paid $3,583.00 in employee benefits, all of which together resulting in WAC having $45,457 in taxable income.

9.     A true and complete copy of the 2017 Federal income tax return for WAC was attached to the Joint Stipulation as **Exhibit B** [Stipulation ¶ 5]. The WAC 2017 Federal income tax return was prepared by Mr. Decker. [Stipulation ¶ 5]. On page 1 of Form 1120S of the 2017 Return, WAC disclosed that it had (a) Gross Income of $275,134.00 (line 1a), (b) paid compensation of its officers (which was the Debtor) of $161,000.00 (line 7), (c) paid other salary and wages of $47,000.00 (line 8), (d) paid $18,700.00 in rents (line 11), (e) paid $17,644.00 in taxes and licenses (line 12), (f) paid $3,887.00 in interest (line 13), (g) claimed an accelerated deduction of $28,180.00 under Section 179 of the Internal Revenue Code for the Ford F-150 Truck (line 14 and Form 4562) (the Debtor caused WAC to purchase this vehicle ten days before the Petition Date) (see Stipulation 13, **Exhibit F**), (h) paid $6,240.00 in pensions & profit sharing

---

[1] This amount equals $7,500.00 per month, the amount Decker disclosed as his monthly income on the Schedule I filed with the Court.

plans, (i) paid $3,280.00 in employee benefits, and (j) paid $37,656.00 in other deductions (line 19), which as reflected on Statement 2 of the return, consisted of computer expense, continuing education, credit card fees, dues & subscriptions, legal & professional expenses, meals & entertainment, office expense, parking & tolls, payroll service fees, postage, shredding, software, telephone, and auto expense, all of which together resulting in WAC having a taxable loss of $48,363.00.

10.     From January 1, 2017, to August 20, 2017, Mr. Decker prepared tax returns and provided public accounting services for WAC.  On or about August 21, 2017, Mr. Decker ceased preparing tax returns and providing public accounting services for WAC.  WAC conducted its business in a leased premises located at 207 N. Cameron Street, Winchester, Virginia, in a building known as "The City Meat Building".  A true and complete copy of the lease of the office space occupied by WAC during the above-described period (the "Lease") was attached to the Joint Stipulation as **Exhibit C**.  [Stipulation ¶ 6].  As Exhibit C reflects, the lessee under the Lease was WAC and as the WAC 2016 and 2017 tax returns reflect, WAC paid the lease payments due under the Lease.

11.     During the period beginning on January 1, 2016, and until August 21, 2017, WAC had two employees, Decker, who was the sole Certified Public Accountant employed by WAC, and Brittany Young.  A true and complete copy of the Payroll Summary of WAC for the period August 2016 through August 2017 was attached to the Joint Stipulation as **Exhibit D** [Stipulation ¶ 7].  On the Payroll Summary of WAC (Exhibit D), the "Officer Salary" applies to Mr. Decker, and not Ms. Young. [Stipulation ¶ 7].  The Payroll Summary provides the following information: (a) for the five months of August through December 2016, WAC paid Decker a total of $27,500.00, an average of $5,500.00 per month (see Exhibit D, pp. 1-3), (b) for the three months of January

through March 2017, WAC paid Decker a total of $20,750.00, an average of $ 6,917.00 per month (see Exhibit D, pp. 3-4), (c) for the five months of April through August 2017, WAC paid Decker a total of $81,500.00, an average of $16,300.00 per month (see Exhibit D, pp. 5-7, (c) from August 20, 2017, the date WAC ceased its business operations [Stipulation 12] to December 31, 2017, WAC paid Decker a total of $58,750.00 in salary (see Exhibit D, pp. 7-9, and (d) from August 20, 2017, the date WAC ceased its business operations to December 31, 2017, WAC paid Brittany Young a total of $14,500.00.  For each of these payments, WAC also paid Social Security and Medicare taxes on account of the payments made to Decker and to Brittany Young.

12.     During the period beginning on January 1, 2017, and ending on or about August 21, 2017, WAC prepared 267 2016 tax returns for its individual clients and 43 2016 tax returns for its corporate or other non-individual clients.  Of those tax returns prepared by WAC during this period, 243 of the returns for individuals and 22 of the returns for non-individuals prepared were for clients for which WAC had prepared a tax return for a tax year prior to 2016. [Stipulation ¶ 10].  From January 1, 2017 to August 21, 2017, WAC provided services other than tax preparation services ("Other Services") for 3 clients.  In 2016, WAC provide Other Services to those same three clients. [Stipulation ¶ 11].

13.     For each and all of the tax preparation services and Other Services provided by WAC during the period beginning on January 1, 2016, and ending on or about August 21, 2017, the engagement agreements or other contracts for services were in the name of WAC, all invoices or statements that WAC provided to its clients were issued in the name of WAC, and all payments made by clients for services provided during the above-described period were deposited in the WAC Bank Account and recorded in the financial records of WAC as its income. [Stipulation ¶

12].  As a result, the clients serviced by WAC during the period at issue were clients of WAC and the revenue generated by the services provided by WAC were property of WAC.

14.     WAC maintained a website located at www.winchestercpa.com.  A true and complete copy of the printable portion of the WAC website was attached to the Joint Stipulation as **Exhibit E** [Stipulation ¶ 9].  On its website, WAC held itself out as a "full-service accounting firm that offers a wide array of individual business services" offering individual and business taxation services and accounting and bookkeeping services and provided information that it maintained an office in the City Market Building at 207 N. Cameron Street, Winchester, Virginia and a business telephone and email system by which WAC could be contacted.

15.     A true and complete copy of the Business Credit Application and the Retail Installment Contract in the name of and signed by WAC for the purchase and financing of the purchase of the 2017 Ford truck were collectively attached to the Joint Stipulation as **Exhibit F** [Stipulation ¶ 13].

16.     A true and complete copy of the insurance Declaration for the insurance for the 2017 Ford truck were attached to the Joint Stipulation as **Exhibit G** [Stipulation ¶ 14].  A true and complete copy of the policy declarations for WAC's additional purchased insurance coverages were attached to the Joint Stipulation as **Exhibit H** [Stipulation ¶ 15].  For each policy identified in Exhibit G and Exhibit H, WAC was the named insured.  The Erie Insurance policy included coverage for Commercial General Liability, Personal Property Loss and Income Protection.  The Camco Mutual Insurance policy included coverage for Accountants Professional Liability coverage, Privacy and Client Network coverage, Errors & Omissions coverage, Network Asset Protection coverage, Employment Practices coverage.

7

17.    A true and complete copy of the Billings Statement by Month and the Invoice List by Date with Gross/Net Bill Amount for WAC were collectively attached to the Joint Stipulation as **Exhibit I** [Stipulation ¶ 16].  The Billings Statement by Month indicates that during the period shown, January 2016 through August 2017, the invoices to clients of WAC were recorded in the financial records of WAC.  Consistent with the date WAC closed its business operations, no billings were made after August 2017 (see Invoice No. 1904 dated August 17, 2017 in the amount of $2,700.00 on page 15 of the Invoice List by Date).  However, a total of $22,695.00 in income from clients were received in the period of September 2017 through December 2017 (see Billings List by Date).  These post-closing funds were assets of WAC and should have only been utilized to pay for post-closing expenses incurred prior to closing, and upon payment of such expenses, distributed to the estate as a shareholder distribution.

18.    WAC maintained a business checking account at Suntrust Bank (the "WAC Bank Account"), into which the Corporation made deposits and withdrawals.  A true and complete copy of the monthly bank statements for the WAC Bank Account for the period January 1, 2017 through and including July 31, 2018 were collectively attached to the Joint Stipulation as **Exhibit J** [Stipulation ¶ 17].  All of the expenses of WAC from January 1, 2017 to on or about August 21, 2017, including without limitation, wages, benefits, insurance, rent, vehicle expenses, and other operating expenses, were paid by WAC from WAC bank accounts, provided that certain minor expenses of WAC were paid by Mr. Decker, personally, and were not reimbursed by WAC. [Stipulation ¶ 18].  For example, as reflected on pages 1 and 2 of the April 30, 2017 Suntrust Bank statement, there is reflected (a) a deposit of $25,0300.00 on April 17, 2017 and two ACH credits totaling $1,150.00, (b) a $2,500.00 ACH debit to Ford Motor Credit on April 4, 2017, (b) a $122.00 ACH debit to the Virginia Department of Taxation, a $205.01 ACH debit to Edward Jones

8

Investment, and a $1,412.32 ACH debit to the Internal Revenue Service on April 12, 2017, (c) a

$2,398.71 ACH debit to Intuit for wages on April 13, 2017, (d) a $1.500.00 ACH debit to WKI

CCH Tax Compliance on April 14, 2017, (e) a $167.56 ACH debit to Comcast on April 24, 2017,

and (f) a $270.61 ACH debit to Anthem on April 25, 2017. This pattern of deposits and credits of

the income of WAC and the ACH debits for the expenses of WAC are consistent throughout each

monthly statement included in **Exhibit J**. It is also significant to note (a) the ending balance shown

on the August 2017 WAC Bank Account Statement shows a balance of $10,038.98 on August 31,

2017 (after the close of WAC's business), (b) checks numbered 123 and 124, each honored by

Suntrust Bank on August 17, 2017, in the amounts of $16,000.00 and $50,000.00, respectively, (c)

"on line banking transfers of $10,000.00 on August 10, 2017 and of $2,000.00 on August 25, 2017

to an account ending in 7868[2], (d) a $24,560.00 ACH debit to the Internal Revenue Service on

August 18, 2017, and (3) a $2,500.00 ACH debit to the Virginia Department of Taxation on August

25, 2017.

19.    A true and complete copy of the WAC Balance Sheet listing the Assets, Liabilities

and Equity of WAC for the period August 31, 2016 through and including August 31, 2017 was

attached to the Joint Stipulation as **Exhibit K**. [Stipulation ¶ 19]. Beginning on page 3 of the

Balance Sheet and continuing through and including page 6 of the Balance Sheet are WAC's

monthly statements of its Assets, Liabilities and Equity for April 2017 through August 2017.

Evident from these monthly statements are that WAC maintained its own assets, including the

Suntrust Account, and its own liabilities during that period (inspection of the statements for April

2016 through March 2017 reflects the same pattern.

---

[2] The Trustee has requested that the Court take judicial notice of statements made by Decker in his Schedules filed
in his case. As more fully set out below, Decker listed in his Schedule B, question 17, a Suntrust checking account
ending 7868.

20.     A true and complete copy of the WAC Profit and Loss statement for the period August 2016 through and including August 2018 was attached to the Joint Stipulation as **Exhibit L**. [Stipulation ¶ 20] . Beginning on page 3 of the Profit and Loss statement and continuing through and including page 6 of the Profit and Loss statement are WAC's monthly statements of income received, expenses incurred and the resultant profit or loss of WAC. Evident from these monthly statements are that (a) WAC received the income from the operation of its business during these periods, and (b) WAC paid all of the expenses of the operation of its expenses during these periods (each of which is consistent with the months prior to April 2017). It is also clear from the Profit and Loss Statement (and from the General Ledger described in paragraph 21 hereinbelow (see pp. 46-47 thereof) that Decker received a salary in an amount inconsistent with his statement of income made in the Schedule I filed in his case. Specifically, the Profit and Loss statement shows that Decker received the following gross salary payments from WAC: (a) $4,000.00 in April 2017, (b) $15,500.00 in May 2017, (c) $7,000.00 in June 2017, (d) $5,000.00 in July 2017, (e) $50,000.00 in August 2017 (while Decker was closing WAC's business), and (f) $57,750.00 in September 2017 (after WAC's business operations had ceased). In total, for the almost five months after the Petition Date in which WAC operated, WAC paid Decker a total of $139,250.00, a total of $101,750.00 more than Decker stated under penalty of perjury that he would be paid in that period. (As a part of these distribution, on August 17, 2017, Decker caused WAC to pay the Internal Revenue Service $24,580.00 and the Virginia Department of Taxation $2,500.00 on behalf of Decker for the Federal and Virginia income taxes he would incur as a result of the distributions made to him (**Exhibit M-1**, page 12).

21.     A true and complete copy of the WAC General Ledger for the period January 1 2016, through and including December 31, 2017 was attached to the Joint Stipulation as **Exhibit**

**M**. [Stipulation ¶ 21][3].  The WAC General Ledger provides both a big picture of WAC's business operations in the period between the Petition Date and the date it ceased operations and provides further detail on the transfers made by WAC to Decker.  On pages 10 through 12 of the General Ledger [**Exhibit M-1**] and again on pages 40-41 of the General Ledger [**Exhibit M-2**], are reflected the direct (and in one instance the indirect) shareholder distributions by WAC to Decker between the Petition Date and the closing of WAC's business, as follows:  (a) on June 28, 2017, Decker caused WAC to make a shareholder distribution to Decker in the amount of $12,500.00 (**Exhibit M-1**, page 10 & M-2, p. 40), (b) on July 7, 2017, Decker caused WAC to make a shareholder distribution to Decker in the amount of $1,000.00 (**Exhibit M-1**, page 11 & **Exhibit M-2**, page 40), (c) on July 16, 2017, Decker caused WAC to make a shareholder distribution to Decker in the amount of $3,500.00 (**Exhibit M-1**, page 11 & **Exhibit M-2**, page 40), (d) on August 12, 2017, Decker caused WAC to make a shareholder distribution to Decker in the amount of $10,000.00 (**Exhibit M-1**, page 11 & **Exhibit M-2**, page 40), (e) on August 15, 2017, Decker caused WAC to make a shareholder distribution to Decker in the amount of $16,000.00 (**Exhibit M-1**, page 11 & **Exhibit M-2**, page 40), and (f) on August 25, 2017, Decker caused WAC to make a shareholder distribution to Decker in the amount of $2,000.00 (**Exhibit M-1**, page 12 & **Exhibit M-2**, page 40).  These payments total $46,000.00 in shareholder distributions made to Decker on account of the WAC shares that were property of the estate at the time of each transfer.

22.     By his Request for Judicial Notice of Adjudicative Facts Pursuant to Federal Rule of Evidence 201 [Docket No. 36], the Trustee has requested that the Court take judicial notice of the following undisputed facts in the record of the Case:

---

[3] Because of the size of this Exhibit, it was filed with the Court as Exhibit M-1 and Exhibit M-2.

27571/1/9305165v1

a.      in the Case, contemporaneously with his filing of the Petition, Decker also filed Official Form 106A/B ("Form 106A/B") found at pages 11 through 16 of Docket No. 1 of the Case;

b.      in answer to Question 7 of Form 106A/B, Decker answered "No", indicating that he had no electronic devices, which the question indicates includes "computers, printers [and] scanners";

c.      In answer to Question 17 of Form 106A/B, Deposits of Money, Decker answered "Yes" and listed one account, a "Suntrust checking account ending 7868" as his only Deposits of Money;

d.      in answer to Question 19 of Form 106A/B, Decker answered "Yes" to the question of whether he held any "Non-publicly traded stock and interests in incorporated and unincorporated businesses, including an interest in an LLC, partnership, and joint venture", Decker answered "Yes" and listed  "Winchester Accounting & Consulting, Inc., Liability = $69,086, Assets = $78,494.80, Net worth = $9408.80";

e.      in answer to Question 26 of Form 106A/B, Patents, copyrights, trademarks, trade secrets, and other intellectual property, which are stated to include "Internet domain names [and] websites", Decker answered "No";

f.      in answer to Question 27 of Form 106A/B, Licenses, franchises, and other general intangibles, which are stated to include professional licenses, Decker answered "No";

g.      in answer to Question 30 of Form 106A/B, Other amounts someone owes you, Decker answered "No";

h.      in answer to Question 35 of Form 106A/B, Any financial assets you did not already list, Decker answered "No";

12

i.      in answer to Question 37 of Form 106A/B, Do you own or have any legal or equitable interest in any business-related property?, Decker answered "No";

j.      in answer to Question 53 of Form 106A/B, Do you have other property of any kind you did not already list?, Decker answered "No";

k.      in answer to Question 1 of Official Form 106G, Schedule G: Executory Contracts and Unexpired Leases, Decker answered "No";

l.      in answer to Question 1 of Official Form 106I, Your Income, Part 1, Decker stated that he was employed by Winchester Accounting and Consulting;

m.      in answer to Question 2 of Official Form 106I, Your Income, Part 2, "List monthly gross wages, salary, and commissions (before all payroll deductions)" and to Question 4 of Official Form 106I, Your Income, Part 2, Calculate Gross Income, Decker, in each instance, answered "$7,500.00";

n.      in answer to Question 8a of Official Form 106I, Part 2, Net income from rental property and from operating a business, profession, or farm, which includes instructions to "[a]ttach a statement for each property and business showing gross receipts, ordinary and necessary business expenses, and the total monthly net income", Decker answered "0.00" and did not attach a statement to Official Form 106I;

o.      in answer to Question 8b of Official Form 106I, Part 2, Interest and dividends, Decker answered "0.00";

p.      in answer to Question 8h of Official Form 106I, Part 2, Other income, Decker answered "0.00";

q.      on Official Form 106Dec, Declaration about an Individual Debtor's Schedules, below the statement "Under penalty of perjury, I declare that I have read the summary

13

and schedules filed with this declaration and that they are true and correct[]", Decker affixed his electronic signature "/s/ Michael Whitman Decker";

       r.     on March 30, 2017, Decker filed a Summary of Assets and Liabilities, Amended Form 106A/B, Amended Form 106C and Amended Declaration Concerning Debtor's Schedules, each of which is found at Docket Entry No. 4; and

       s.     on the Amended Declaration about an Individual Debtor's Schedules, below the statement "Under penalty of perjury, I declare that I have read the summary and schedules filed with this declaration and that they are true and correct to the best of my knowledge, information and belief[]", Decker affixed his electronic signature "/s/ Michael Whitman Decker".

There were no amendments to Official Form 106I included in the filing by Decker.

      23.    Decker's statements made in the Form 106A/B, Form 106G and Form 106I, which he declared by signing Form106 Dec, that he was making under penalty of perjury constitute judicial admissions and he is judicially estopped from asserting any factual or legal position to the contrary.  In his schedules, Decker has admitted that he personally owned (a) no electronic devices, which includes "computers, printers [and] scanners", (b) a single checking account described as "Suntrust checking account ending 7868", (c) no patents, copyrights, trademarks, trade secrets, and other intellectual property, which are stated to include "Internet domain names [and] websites", (d) no licenses, franchises, and other general intangibles, including professional licenses, (e) no other amounts someone owes him, (f) no financial assets he had not otherwise listed, (g) no legal or equitable interest in any business-related property, (h) no other property of any kind not already listed and that he has no leases or executory contracts.

      24.    In addition, Decker has admitted in his Form 106I that (a) he was employed by Winchester Accounting and Consulting, (b) his monthly gross wages, salary, and commissions

14

(before all payroll deductions)" was "$7,500.00", (c) he was receiving no net income from rental property and from operating a business, profession, or farm, (d) he was receiving no interest and dividends, and (e) he was receiving no other income.  These statements made by Decker in Form 106I are significant in light of the Instructions for Schedule I: Your Income (Official Form 106I), which state that Schedule I asks about the income you [the debtor] are now receiving. *See, Instructions, Bankruptcy Forms for Individuals,* p. 29; *see also, Official Form 106, 2005-2007 Committee Note, Schedule I* (…the purpose of this schedule is to obtain information about actual income on the date the bankruptcy case is filed and which a debtor reasonably expects in the future…).  The Trustee requests that the Court take judicial notice of the Instructions, Schedule I: Your Income (Official Form 106I) which is attached hereto as **SJ Exhibit 1** pursuant to the requirements of Federal Rule of Evidence 201(c)(2).

### Argument No. 1:  Any Post-Petition Shareholder Distributions Made by WAC to Decker are Transfers of Property of the Estate Avoidable under Section 549(a)

25.    By the Stipulation, it is not in dispute that the stock of WAC owned by Decker at the Petition Date became property of the estate of the Case pursuant to section 541(a) of the Bankruptcy Code upon Decker's filing of his petition under Chapter 7 of the Bankruptcy Code. Distributions are made to shareholders on account of their shares and only by authorization of the corporation's board of directors. *See, e.g., Va. Code Ann. § 13.1-653(A).*

26.    Section 541(a)(6) of the Bankruptcy Code provides that property of the estate includes the "[p]roceeds, product, offspring, rents or profits or from property of the estate, except as are earnings from services performed by an individual debtor after the commencement of the case."  Section 541(a)(7) of the Bankruptcy Code provides that property of the estate includes "[a]ny interest in property that the estate requires after the commencement of the case."

15

27.     Under each of these subchapters of section 541(a), the distributions Decker caused WAC to distribute to him in his capacity as a "shareholder" are distributions on account of the shares of the stock of WAC.  Not only are the shares of WAC property of the estate, any distributions to the holder of those shares, which at the time of distribution were the bankruptcy estate, are property of the estate.

28.     These distribution payments described in paragraph 21 hereinabove that Decker caused WAC to make to him were described in the WAC General Ledger as "Shareholder Distribution", so there can be no dispute over the nature of these transfers.  In fact, Decker is bound by this description.  Because each of these payments were made after the Petition Date as a distribution on account of the shares of WAC and because the estate was the holder of those shares of WAC at the time of each of the distributions, each of these Shareholder Distributions were transfers of property of the estate to Decker that are avoidable by the Trustee under section 549(a) of the Bankruptcy Code.

29.     Even if Decker had not caused the Shareholder Distributions to be described as such in the WAC General Ledger, such distributions on account of corporate stock are property of the estate under both section 541(a)(6) as proceeds of property of the estate and section 541(a)(7) as property acquired by the estate after the commencement of the case.  In any event, Decker is bound by the descriptions of those transfers made to him.

30.      Each of the Shareholder Distributions described in paragraph 21 are transfers of property of the estate and are therefore avoidable under section 549(a) of the Bankruptcy Code.

## Argument No. 2:  Decker is Bound by the Statements<br>Made by Him under Penalty of Perjury in his Schedules Filed in the Case.

31.     In his Schedule I filed with the Court and signed under penalty of perjury, Decker states that his monthly income is $7,500.00 and that he had no other source of income, including

16

no dividends or distributions from WAC. Notwithstanding that the Case has been pending for over three years and despite the current contested litigation with the Trustee, the Debtor has not filed any amendment to that Schedule. Decker's statement is a judicial admission that his income during the period between the Petition Date and the date of the closing of WAC's business was $7,500.00 per month and that he was not entitled to shareholder distributions. As the Instructions and Official Committee Note for Schedule I states, the purpose of Schedule I is to obtain information about actual income on the date the bankruptcy case is filed and which a debtor reasonably expects in the future.

32.     Statements in bankruptcy schedules signed under penalty of perjury are eligible for treatment as judicial admissions when offered against the debtor who signed those bankruptcy schedules. *In re Bohrer*, 266 B.R. 200, 201 (Bankr. N.D. Calif. 2001), *quoting In the Matter of Gervich*, 570 F.2d 247, 253 (8th Cir.1978); *In re Jorczak*, 314 B.R. 474, 483 (Bankr. D. Conn. 2001), quoting *In re Bohrer*.

33.     Decker has judicially admitted in his Schedule that his post-petition income would be $7,500.00 and that he would not receive any dividends or other sources of income. Based on this evidence, none of the salary and wages paid to Decker in excess of $7,500.00 for the months of April 2017 through August 2017 can constitute "earnings from services performed by an individual debtor after the commencement of the case" as provided in section 541(a)(6), so as to exclude those excess salary and wages from property of the estate. To the contrary, all payments Decker caused WAC to pay to him or for his benefit in excess of the $7,500.00 in salary are distributions on account of the WAC stock held by the estate at the time of the transfers that diminished the value of that stock and which are transfers avoidable by the Trustee.

17

**Argument No. 3:  Neither the Shareholder**
**Distributions nor the Excess Salary & Wages Paid to Decker Constitute Earnings from**
**Services Performed by an Individual Debtor after the Commencement of the Case**

34.     In order to qualify for the exception from property of the estate set forth in section

541(a)(6) of the Bankruptcy Code, what Decker received must have been "earnings for services

perform by him "individually" after the commencement of the case.  The oft-cited case of *In re*

*Fitzsimmons* dealt with the section 546(a)(6) "earnings exception" in the context of the Chapter 11

case of an individual who operated a sole proprietor law firm.  *In re Fitzsimmons (Fitzsimmons v.*

*Walsh)*, 725 F.2d 1208, 1209 (9th Cir. 1983).  The Fitzsimmons Court held that "the earnings

exception [of section 541(a)(6)] applies only to services performed *personally* by an individual

debtor" and the debtor is "only entitled to the funds generated by his law practice only to the extent

that the are attributable to personal services that he himself performs."  *Id. at* 1212 (*emphasis* in

original).   Earnings that are instead attributable to the business's invested capital, accounts

receivable, goodwill, employment contracts with the firm's staff, client relationships, fee

agreements or the like are property of the estate under section 546(a)(6) of the Bankruptcy Code.

*Id., see also, In re Christy*, 306 B.R. 611, 613 (Bankr. C.D. Ill. 2004), *citing Fitzsimmons*; *In re*

*Pecht,* 57 B.R. 137, 141 (Bankr. E.D. Va. 1986) (*same*).

35.     The plain reading of section 541(a)(6) provides for a narrow exception for earnings

of a debtor that are derived from the debtor's post-petition services.  This exception does not

include the profits of the business to which the debtor provided those services.  *In re Moyer*, 421

B.R. 587, 593  (Bankr. S.D. Ga. 2007).  Thus, any increase in the value of the stock of WAC that

Decker paid himself as a shareholder distribution was a transfer of property of the estate that

resulted in the diminution of the value of that property of the estate.  *Id.* (holding that "an increase

in stock value is not earnings from services personally performed by the Debtor.")

36.    There is sufficient evidence before the Court to determine what portion of the salary Decker caused WAC to pay to  him after the Petition Date, if any, are entitled to the earnings exemption of section 541(a)(6).  That amount is $7,500.00 for the months of April through August 2017, a total of $37,500.00.  This evidence fully supports the conclusion that only $37,500.00 qualifies for that exemption from property of the estate.  This evidence is fully set out in the Stipulation, in a summary and detail of the facts derived from the Stipulation in paragraphs 6 through 20 of this Motion and in the record of the Case of which the Trustee has requested the Court to take judicial notice.  Specifically, (a) WAC was a Virginia corporation, (b) the shares of WAC stock became property of the estate on the Petition Date, (c) WAC was the lessee of the office where WAC conducted its business, (d) WAC had two employees, Decker, the only CPA employed by WAC, and an assistant Brittany Young, to which WAC paid salary and benefits, (e) in 2017, WAC had (i) 243  of the 267 individual tax preparation clients it had prepared tax returns for in 2016, (ii) 22 of the corporate tax preparation clients it had prepared tax returns for in 2016, and (iii) the same 3 clients for other accounting services in 2017 that it had in 2016, (f) all engagement agreements were between the clients and WAC, (g) payment by clients for services provided by WAC were deposited in the WAC Suntrust bank account and recorded as income in WAC's financial records, (h) WAC maintained its own website, telephone number and email address, (i) WAC purchased a motor vehicle in its own name for use by Decker in business matters, (j) WAC procured and paid with its funds (i) insurance covering the potential risk of loss and liabilities related to the ownership and operation of the motor vehicle and (ii) insurance covering the potential liabilities arising out of the operation of WAC's business, which insurance included professional liability insurance, (k)

WAC considered the clients served by WAC and the revenue generated by such services provided to be the revenues of WAC, (l) all expenses of the operation of WAC in 2017 were paid by WAC with its funds, including wages, employment taxes, benefits, insurance, rent, and vehicle expense.

37.     Each of these elements of the operation by WAC of its business was necessary and essential to the conduct of its business and to Decker's ability to provide the services he was licensed to provide.    Each of these elements of the operation by WAC of its business were its property, were essential for that operation of its business and which contributed to the revenue received by WAC and the value of the stock of WAC.  The clients served during 2017 were the clients of WAC and the revenue derived from serving those clients was the revenue of WAC.  The lease of the office, the website, the telephone, the office equipment, the insurance, the office assistant, the relationships with its clients and the goodwill[4] of WAC, for example, were in each instance, essential and necessary for the operation of the business and the generation of income. The logical and irrefutable conclusion from these facts is that the income derived from WAC's operation of its business is property of the estate because it increased the value of the WAC stock, making such income proceeds from property of the estate.  Such proceeds are only subject to the exemption of section 541(a)(6) to the extent the Court determines that a portion of that income constitutes "earnings from services performed by" Decker.

38.     With this conclusion in mind, the question arises of how the Court determines what portion of the income of WAC can be considered earnings from services performed by Decker. That question is answered by Decker's statement in his Schedule I filed with the Court:  $7,500.00 each month for the months of April through August 2016, a total of $37,500.00. The salary and wages Decker caused WAC to pay him in that period in excess of the $37,500.00 is $123,500.00,

---

[4] Goodwill has been defined as "something of value  in a going concern which attaches by reason of its name, location, skill, reputation and the like…"  In re Watman, 301 F.3d 3, 12 (1st Cir. 2002).

20

and the amount of excess employer taxes on those excess payments, which based on tax rates of 6.5% for Social Security (up to $127,200.00) and 1.45% for Medicare totals an additional $5,971.63.[5]  In total, Decker caused WAC to disburse funds to him that did not constitute earnings of $129,471.63.

39.    It is important to note that the amount stated by Decker in his Schedule I is consistent with the amount of earnings derived from an analysis of Exhibit A to the Joint Stipulation, the WAC 2016 corporate tax return [Stipulation ¶ 4], and Exhibit B to the Joint Stipulation, the WAC 2017 corporate tax return [Stipulation ¶ 5].

40.    The WAC 2016 corporate tax return states that during tax year beginning on January 1, 2016 and ending on December 31, 2016, WAC (a) had Total Income of $385,432.00 (line 6), (b) paid Decker compensation of $90,000.00 (line 7), (c) had total expenses of $340,000.00, including the Decker compensation (line 20), and (d) ordinary business income after expenses of $45,467.00 (line 21). Ordinary business income without inclusion of the Decker compensation in deductions equaled $135,467.00 (the "2016 Adjusted Income"). The compensation paid by WAC to Decker in 2016 constituted 66.44% of the 2016 Adjusted Income.

41.    The WAC 2017 corporate tax return states that during tax year beginning on January 1, 2017 and ending on December 31, 2017, WAC (a) had Total Income of $275,134.00 (line 6), (b) paid Decker compensation of $161,000.00 (line 7), (c) had total expenses of $340,000.00, including the Decker compensation (line 20) and (d) a net loss of $48,363.00 (line 21).  Adjusting the net income to exclude the Decker compensation from deductions and also adjusting the net income by excluding the amount of the non-cash section 179 depreciation of $26,505.00 (see Statement 4 of the 2017 return), results in net income for WAC in 2017 of

---

[5] See Internal Revenue Service Publication, Circular E (Employer Tax Guide 2017), pp. 23-24.

27571/1/9305165v1

$139,132.00 (the "2017 Adjusted Income"). Applying the percentage of Decker's compensation of the 2016 Adjusted Income (66.44%) to the 2017 Adjusted Income, results in a comparable $92,439.30 2017 annual salary and a comparable monthly salary of $7,703.28, due to Decker for his employment by WAC. Based on this calculation, of the total income of WAC earned during 2017, Decker's share of WAC's income that was earnings from services personally performed by Decker for the months of April 2017 through August 2018, when his employment ended, was $38,516.40. Having caused WAC to pay him a total of $161,000.00 after the Petition Date, under this analysis, the remaining balance of salary paid to Decker that does not qualify for the section 541(a)(6) exclusion from property of the estate is $122,483.60 and the amount of additional Social Security and Medicare payments is $5,400.75. That amount is property of the estate that was transferred to Decker and reduced the value of property of the estate.

42.    The post-petition Shareholder Distributions speak for themselves. Those distributions which Decker caused WAC to pay to him after the Petition Date are indisputably proceeds of property of the estate and not earnings of the Debtor.

**Argument No. 4:**
**There is No Evidence before the Court that Decker was Authorized to Increase**
**His Salary from What Was Stated in Schedule I or to Issue Dividends to Himself**

43.    The bankruptcy estate became the sole shareholder of WAC on the Petition Date. There is no evidence that the Trustee on behalf of the estate authorized an increase in wages to be paid to Decker or authorized a shareholder distribution to Decker or anyone else. There is also no evidence that any board of directors of WAC authorized an increase in wages to be paid to Decker or authorized a shareholder distribution to Decker. What is in evidence is that Decker unilaterally and without authority increased his salary and made shareholder distributions to himself as if he were still the holder of the shares of stock of WAC.

22

**Argument No. 5:  Other Transfers Decker Caused to be Made to Third**
**Parties Were for the Benefit of Decker and Are in Effect Shareholder Distributions**

44.    WAC ceased business operations in late August 2017.  Despite the cessation of its

business, Decker caused WAC to continue to make payments for his benefit from the funds of

WAC.  Pages 5 through 10 of the WAC Profit and Loss Statement, **Exhibit L** [Stipulation ¶ 20]

show that from September 2017 through and including August 2018, exclusive of the salary paid

by Decker in September 2017, WAC paid a total of $36,111.68 in expenses (see pp. 5-10).  These

payments were not payment of earnings from services performed by Decker for WAC and not for

the benefit of WAC but for the benefit of Decker.  Each of those payments were, in effect,

distributions of the proceeds of property of the state to Decker that reduced the value of the stock

of WAC.

**Conclusion & Request for Summary Judgment**

46.    Decker caused WAC to make shareholder distributions to him after the Petition

Date.  At the time of each of these shareholder distributions, the stock of WAC was property of

the estate pursuant to section 541(a) of the Bankruptcy Code.  The distributions designated as

"shareholder distributions" that Decker caused WAC to make to himself total $46,000.00, the

excess wages and employment taxes Decker caused WAC to pay for him or on his behalf total

$129,471.63, and the expenses Decker caused WAC to pay on his behalf after WAC closing total

$36,111.68.  Each of these proceeds constitute proceeds and profits of property of the estate.  Each

and all of these transfers diminished the value of property of the estate, the WAC stock.  Section

549(a)(1) of the Bankruptcy Code permits a trustee to avoid a transfer of property of the estate that

occurs after the commencement of the case.  Section 550(a) permits a trustee to recover a transfer

avoided under section 549 of the Bankruptcy Code from the initial transferee, which in this

23

instance is Decker.  The Trustee requests that the Court find and conclude that the distributions

Decker caused WAC to make to him in the total amount of $211,583.31 are transfers of property

of the estate after the commencement of this Case, that the transfers are avoidable under section

549 of the Bankruptcy Code, that Decker is the initial transferee of the distributions, and that the

trustee may recover the avoided distributions from Decker, and based on these findings of fact and

conclusions of law, enter judgment against Decker in the amount of 211,583.31.

47.    Section 502(d) provides that the Court shall disallow any claim of any entity from

which property is recoverable under section 550 of the Bankruptcy Code or that is a transferee of

a transfer avoidable under section 549 of the Bankruptcy Code, unless such entity or transferee has

paid the amount or turned over any such property for which such entity or transferee is liable under

section 550 of the Bankruptcy Code.  The Trustee requests that the Court find and concluded that

the Trustee is entitled to the disallowance of all claims of Decker in this case until the amounts

awarded by the Court to the Trustee in this proceeding are paid in full.

48.    Section 544(a)(1) of the Bankruptcy Code provides that the Trustee shall have the

rights and powers of judgment lien creditor.  Section 8.01-382 of the Code of Virginia (1950, as

amended) provides that any final order, judgment or decree entered shall provide for interest on

the principal sum awarded to the plaintiff and shall fix the date on which interest shall commence.

The Trustee requests that the Court find and conclude that the Trustee is a holder of the rights of a

judgment lien creditor and that the Trustee and the estate are entitled to interest at the rate of six

percent (6%) annually, pursuant to section 6.2-302 of the Code of Virginia (1950, as amended),

commencing on the original date of the commencement of this Adversary Proceeding, on all

amounts awarded by the Court in this proceeding.

27571/1/9305165v1

W. STEPHEN SCOTT, TRUSTEE FOR
MICHAEL W. DECKER


By:  /s/ William E. Callahan, Jr.
        Counsel

William E. Callahan, Jr., Esq. (Va. Bar No. 37432)
GENTRY LOCKE RAKES & MOORE, LLP
P.O. Box 40013
Roanoke, VA 24022-0013
Telephone:  (540) 983-9309
Facsimile:  (540) 983-9400
Email:  callahan@gentrylocke.com

         Counsel for the Trustee

### Certificate of Service

I hereby certify that on May 1, 2020, I filed the above Motion for Summary Judgment with the Court using the Court's CM/ECF filing system, thereby causing a copy thereof to be served upon counsel for the Defendants in this proceeding.


                        s/ William E. Callahan, Jr.
                             Counsel

25

27571/1/9305165v1