

SIGNED THIS 30th day of September, 2020

*Rebecca B. Connelly*
——————————————
Rebecca B. Connelly
UNITED STATES BANKRUPTCY JUDGE

THIS MEMORANDUM OPINION HAS BEEN ENTERED ON THE
DOCKET. PLEASE SEE DOCKET FOR ENTRY DATE.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA

In re:
**MICHAEL WHITMAN DECKER,**              **Chapter 7**
    **Debtor.**                          **Case No. 17-50297**

**W. STEPHEN SCOTT, Chapter 7 Trustee,**
    **Plaintiff,**
**v.**                                   **Adv. P. No. 19-05006**
**MICHAEL WHITMAN DECKER,**
**WINCHESTER ACCOUNTING, LLC,**
    **Defendants.**

## MEMORANDUM OPINION

This dispute in this chapter 7 bankruptcy case is over property of the estate and the limits of the "earnings exception" to the definition of property of the estate. The chapter 7 trustee seeks to recover transfers of property of the estate. The debtor insists the property transferred was not property of the estate. The answer depends in large part over which language in section 541(a)(6) describes the property transferred. If the property transferred is "proceeds, product, offspring, rents, or profits of or from property of the estate," section 541(a)(6) defines it as property of the estate, and the trustee may recover it. Conversely, if it is "earnings from services performed by an individual debtor after the commencement of the case," section 541(a)(6) excepts it from

property of the estate, and the trustee may not recover it.

*Background*

W. Stephen Scott (the "Trustee") is the chapter 7 trustee for Michael Whitman Decker. The Trustee filed a complaint against Mr. Decker and his current business, Winchester Accounting, LLC ("Winchester Accounting").   In the complaint, the Trustee seeks (i) avoidance of postpetition transfers pursuant to section 549; (ii) judgment for the amount of the avoided transfers pursuant to section 550; (iii) damages for conversion of property of the estate; and (iv) disallowance or subordination of any claim of the defendants until the judgment is paid in full under section 502(d).

Mr. Decker and Winchester Accounting moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).   The Court granted in part and denied in part the motion to dismiss.   The Court also granted leave to amend the complaint.   After that, the Trustee amended his complaint, and Mr. Decker and Winchester Accounting answered it.

Now, the Trustee and both defendants have filed cross motions for summary judgment. Each insists no material facts are in dispute and as a matter of law, this Court should grant judgment in their respective favor.   They filed a joint stipulation of facts and exhibits to the stipulation plus separate exhibits in support of their motions.   The defendants jointly filed a single motion.   In addition to previously filed exhibits, the defendants attached two affidavits in support of their motion for summary judgment.   To this, the Trustee objected.   He moved to strike the affidavits. Afterwards, the parties resolved the disagreement over the affidavits, and prior to the hearing on the Trustee's motion to strike, the Trustee and defendants' counsel submitted a consent order withdrawing the Trustee's motion to strike.   Based on their agreement, the parties waived oral

2

argument and submitted their cross motions for summary judgment to the Court for consideration on the written pleadings.

## JURISDICTION

The Court has jurisdiction over this bankruptcy case by virtue of the provisions of 28 U.S.C. §§ 1334(a) and 157(a), the delegation made to this Court by Order of Reference from the District Court entered on December 6, 1994, and Rule 3 of the Local Rules of the United States District Court for the Western District of Virginia.   The Trustee seeks (i) avoidance of postpetition transfers pursuant to Bankruptcy Code section 549; (ii) judgment against Mr. Decker and Winchester Accounting for the amount of the avoided transfers pursuant to Bankruptcy Code section 550; and (iii) disallowance or subordination of any claim of the defendants until the judgment is paid in full under Bankruptcy Code section 502(d).   These proceedings are "core" proceedings under 28 U.S.C. § 157(b)(2)(B), (E), (H), and (O).

## DISCUSSION

The parties ask this Court to determine whether as a matter of law the Trustee may recover funds from the debtor and his corporation formed approximately five months after he filed his bankruptcy petition.   Their motions for summary judgment boil down to two fundamental questions.   First, if all of the stock in a personal services S Corporation is owned by one individual who files a chapter 7 bankruptcy, are all funds held by the S Corporation "earnings from services performed by an individual debtor after the commencement of the case," regardless of when the services were performed?   Second, if all the shares of stock of an S Corporation are property of the estate, are shareholder distributions made postpetition property of the estate as "proceeds, product, offspring, rents, or profits" from the stock?

3

The defendants ask this Court to rule as a matter of law that the Trustee cannot recover any transfers because all property transferred was not property of the estate.  The Trustee, on the other hand, asks this Court to rule as a matter of law that the property he seeks to recover is property of the estate, the debtor cannot contest the transfers of the property or the amounts transferred, and accordingly judgment as a matter of law to the Trustee is appropriate.

*Is Summary Judgment Appropriate?*

Federal Rule of Civil Procedure 56(c) is applicable to this proceeding pursuant to Federal Rule of Bankruptcy Procedure 7056.  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Facts are 'material' when they might affect the outcome of the case, and a 'genuine issue'[1] exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party."  *News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  When considering summary judgment, a court determines "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson*, 477 U.S. at 251–52.

The Court will evaluate whether either movant is entitled to judgment as a matter of law under this framework.

---

[1]     When the Fourth Circuit articulated its interpretation of "genuine issue" in *News & Observer Publishing Co. v. Raleigh-Durham Airport Authority*, 597 F.3d 570 (4th Cir. 2010), Rule 56(c) contained the summary judgment standard utilizing the phrase "genuine issue."  Later in 2010, the year the Fourth Circuit issued its opinion, an amendment to Rule 56 went into effect; the amendment moved the standard to subdivision (a) and changed "genuine issue" to "genuine dispute."  The amendment, however, did not alter the summary judgment standard.  According to the Advisory Committee Notes accompanying the 2010 amendments, the amended provision "carries forward the summary-judgment standard expressed in former subdivision (c)," and the word change did "not affect continuing development of the decisional law construing and applying these phrases."  Fed. R. Civ. P. 56 advisory committee's note to 2010 amendment.

*Are any material facts in dispute?*

    *The history*

This case has been going on, as of now, for over three years.   Mr. Decker filed this chapter 7 bankruptcy on March 30, 2017.

Mr. Decker was the sole shareholder of stock in Winchester Accounting and Consulting, Inc. ("WAC").   When Mr. Decker filed his chapter 7 bankruptcy petition, the stock became property of his bankruptcy estate.   *See* 11 U.S.C. § 541.

A few months into the chapter 7 case, the debtor's former employer, Kilmer & Associates, offered to purchase the debtor's stock in WAC from the Trustee.   The Trustee, whose duty is to liquidate assets for the benefit of creditors, agreed to the offer and sought court approval to sell the estate's interest in the stock.   The debtor cried foul and demanded the Court deny the Trustee approval to sell the stock for the price offered.[2]   The debtor asserted the sale price would result in a tax liability for the estate.   He insisted that the sale should not be allowed because the Trustee had not disclosed the method of determining the tax liability or the means to satisfy any tax liability.   And so, at the hearing on his motion for authority to sell the stock, the Trustee requested a continuance to permit his accountant to provide an analysis of the tax liability and to allow for an evidentiary hearing.   The Trustee explained that he would need to review WAC's bank statements, plus its books and records, in order to allow his accountant to provide an analysis of the potential tax liability.

The Court granted the Trustee's request and ordered that the hearing be continued to a date which would permit WAC to provide the necessary documents to the Trustee and the Trustee's

---

[2]    *See* ECF Doc. No. 23, Case No. 17-50297.

accountant to provide an analysis of the tax consequences of the potential sale.   The Court orally directed Mr. Decker, present at the hearing, to provide copies of the WAC bank statements to the Trustee and to confer with the Trustee before using any funds in the WAC bank account.   The Court explained that the purpose of the directive was to allow the Trustee to review whether the expenditures were ordinary and necessary business expenses or profits owing to the shareholder (the estate).   This was on August 16, 2017.

Mr. Decker did not provide the documents to the Trustee[3] nor confer with the Trustee regarding WAC expenditures and business expenses.

On August 21, 2017, Mr. Decker created Winchester Accounting, a limited liability company in which Mr. Decker is the sole member.   After this, Mr. Decker transferred assets held by WAC, including funds in the WAC bank account, to Winchester Accounting, and began operating under Winchester Accounting, in the same location where WAC operated.[4]

To date, the Court has not held a valuation hearing, nor made findings regarding the value of the stock in WAC, nor determined whether the sale may result in tax liability for the estate, nor held a further hearing on the Trustee's motion to sell.   For much of the two years after the Trustee made his request to sell the stock, the Trustee and the debtor battled over the Trustee's discovery requests.[5]   The debtor, for the most part, objected to the discovery requests asserting the Trustee

---

[3]      Mr. Decker did eventually provide documents to the Trustee, but not during the period following the Court's directive at this hearing.

[4]      Winchester Accounting acquired the assets of WAC but did not provide consideration to WAC for the assets. Ex. A to Mot. to Quash ¶ 9, ECF Doc. No. 61-1, Case No. 17-50297.

[5]      *See* Mot. to Quash Subpoena *Duces Tecum*, ECF Doc. No. 26, Case No. 17-50297; Mot. to Quash Subpoena *Duces Tecum*, ECF Doc. No. 61, Case No. 17-50297; *see also Decker v. Scott (In re Decker)*, Civ. No. 5:19-cv-00009, 2019 WL 4491332 (W.D. Va. Sept. 18, 2019) (dismissing for lack of subject-matter jurisdiction Mr. Decker's appeal of the order denying the second motion to quash the Trustee's subpoena and compelling him as the representative of Winchester Accounting to comply with the discovery order).

had no standing to make the requests because earnings of his S Corporation were excluded from his bankruptcy estate.   The Trustee, for the most part, contended he had a duty to investigate the financial affairs of the debtor and to liquidate property of the estate and the inquiries were part of his investigation and evaluation process.

The case proceeded for several more months until the Trustee withdrew the motion to sell and filed this adversary proceeding.   As of now, documents have been exchanged and the parties have come to an agreement on most of the facts and on the documents.   The parties agree that at bottom this case turns on legal questions, and it is appropriate for the Court to rule.

*The material facts are not in dispute*

The parties stipulated to numerous facts.   *See* Stipulation, ECF Doc. No. 33.   Certain noteworthy stipulated facts include the following:

- Winchester Accounting and Consulting, Inc. ("WAC") is a Virginia stock corporation.   *Id.* ¶ 1.

- WAC is taxed as an S Corporation pursuant to Subchapter S of the Internal Revenue Code.   *Id.*

- Mr. Decker was the sole shareholder, director, and officer of WAC during the period commencing on January 1, 2017, and at the time of his filing of a voluntary petition under Chapter 7.   *Id.* ¶ 2.

- On the Petition Date, Mr. Decker's shares of WAC stock became property of the estate in Mr. Decker's bankruptcy case.   *Id.* ¶ 3.

- From January 1, 2017, to August 20, 2017, Mr. Decker prepared tax returns and provided public accounting services for WAC.   On or about August

7

21, 2017, Mr. Decker ceased preparing tax returns and providing public
accounting services for WAC.   *Id.* ¶ 6.

- For each and all of the tax preparation services and Other Services[6]
  provided by WAC during the period beginning on January 1, 2016, and
  ending on or about August 21, 2017, the engagement agreements or other
  contracts for services were in the name of WAC, all invoices or statements
  that WAC provided to its clients were issued in the name of WAC, and all
  payments made by clients for services provided during the above-described
  period were deposited in the WAC Bank Account and recorded in the
  financial records of WAC as its income.   *Id.* ¶ 12.

In addition to the stipulation, the parties agree as to the exhibits attached to the stipulation.
Many of the exhibits were prepared by Mr. Decker, including WAC's 2016 and 2017 corporate
tax returns, WAC's general ledger, WAC's balance sheet, WAC's payroll summary, a billings
statement for WAC, and the profit and loss statements.   *Id.* ¶¶ 4–7, 13–17, 19–21.   These
exhibits, plus the pleadings themselves, show the following additional uncontested facts.

- As of December 31, 2016, WAC had retained earnings of $66,787.32.   Ex. A
  to Stipulation, at 4, ECF Doc. No. 37-1 (2016 tax return); *see also* Ex. K to
  Stipulation, at 2, 4, ECF Doc. No. 42-2.

- Between January 1, 2017, and March 30, 2017, shareholder distributions were
  paid totaling $9,850, and in turn, reducing the WAC retained earnings.   Ex. M-

---

[6]     "Other Services" is used in the parties' stipulation to describe services other than tax preparation services
that WAC provided for three clients during the time period from January 1, 2017, to August 21, 2017.   Stipulation ¶
11, ECF Doc. No. 33.

2 to Stipulation, at 14, ECF Doc. No. 43-1; Ex. K to Stipulation, at 4, ECF Doc. No. 42-2.

- In January 2017, WAC prepaid $18,700 for 11 months of its rent (February through December 2017) and $1,200 for parking, which appears to be for parking for the remainder of 2017.   Ex. M-1 to Stipulation, at 6, ECF Doc. No. 43.   On February 28, 2017, WAC paid the monthly vehicle loan payment of $1,428.76 plus an additional $2,071.24.   *See id.* at 7; Ex. F to Stipulation, at 3, ECF Doc. No. 37-5.   These prepetition distributions reduced the postpetition WAC expenses.

- In February 2017, WAC purchased a vehicle for approximately $70,000 and entered into a loan for the purchase, which debt was secured by the vehicle. Ex. F to Stipulation, at 1, 3, ECF Doc. No. 37-5.

- On March 29, 2017, WAC had accounts receivable of $47,055.   Ex. A to Mot. to Quash ¶ 14, ECF Doc. No. 61-1, Case No. 17-50297.

- WAC billing summaries report billings for the calendar year 2016 of $392,764.50 but receipts of $364,432 and so at least $28,332.50 was owed to WAC in 2017 for billings issued in 2016.   Ex. I to Stipulation, at 1, ECF Doc. No. 37-8.

- WAC billing summaries report billings between January 2017 and March 30, 2017, exceed receipts during that period.   Ex. I to Stipulation, at 1, 10–12, ECF Doc. No. 37-8.

- WAC billing summaries report billings between March 30, 2017, and August

9

17, 2017, are less than amounts received during that period.    Ex. I to Stipulation, at 1, 12–16, ECF Doc. No. 37-8.

- During 2017, WAC recorded on its general ledger shareholder distributions in the following amounts:

  - January 24, 2017        $5,500
  - January 27, 2017        $3,350
  - March 6, 2017           $1,000
  - June 28, 2017           $12,500
  - July 7, 2017            $1,000
  - July 16, 2017           $3,500
  - August 12, 2017         $10,000
  - August 25, 2017         $2,000
  - October 2, 2017         $1,500
  - October 13, 2017        $2,000

Ex. M-2 to Stipulation, at 14–15, ECF Doc. No. 43-1.

- In April 2017, WAC had billings of $83,832 and operating expenses of $11,084.88.   Ex. I to Stipulation, at 1, ECF Doc. No. 37-8; Ex. L to Stipulation, at 4, ECF Doc. No. 42-3.   In May 2017, WAC had billings of $13,133 and operating expenses of $30,172.44.   Ex. I to Stipulation, at 1, ECF Doc. No. 37-8; Ex. L to Stipulation, at 4, ECF Doc. No. 42-3.   In June 2017, WAC had billings of $14,235 and operating expenses of $15,339.12.   Ex. I to Stipulation, at 1, ECF Doc. No. 37-8; Ex. L to Stipulation, at 6, ECF Doc. No. 42-3.   In

July 2017, WAC had billings of $60,610.50 and operating expenses of $12,291.02.   Ex. I to Stipulation, at 1, ECF Doc. No. 37-8; Ex. L to Stipulation, at 6, ECF Doc. No. 42-3.   The average WAC expenses per month for April 2017 through July 2017 was $17,221.86.   In July 2017, WAC received a total accounting services income of $99,102.50 and at the end of July 2017 had net income of $86,811.48.   Ex. L to Stipulation, at 5–6, ECF Doc. No. 42-3.

- At the end of July 2017, the Trustee filed a motion to sell the stock of WAC. *See* ECF Doc. No. 22, Case No. 17-50297.

- On August 15, 2017, WAC issued a check to Mr. Decker for $16,000 and a second check to Mr. Decker for $50,000.   Ex. M-1 to Stipulation, at 11, ECF Doc. No. 43.

- After August 21, 2017, Mr. Decker began operating an accounting business in the form of Winchester Accounting, which is a limited liability company formed on or about August 21, 2017.   Mr. Decker is the sole member.   *See* Am. Compl. ¶ 5, ECF Doc No. 2; Ans. ¶ 5, ECF Doc. No. 27.

- WAC ceased operations in August 2017.   Mot. to Quash, at 4, ECF Doc. No. 61, Case No. 17-50297.

- The general ledger reports under the category Shareholder Distributions "Check" on August 15, 2017, with a notation "VOID," the payee blank, and a zero value for the check.   Ex. M-2 to Stipulation, at 14, ECF Doc. No. 43-1. The general ledger also records on the same day, August 15, 2017, a "Paycheck" to Michael Decker with check number 123 for $16,000 with the

11

memo "Direct Deposit."   Ex. M-1 to Stipulation, at 11, ECF Doc. No. 43.

- WAC bank records show check 123 was paid in the amount of $16,000 on August 17, 2017.   Ex. J to Stipulation, at 19, ECF Doc. No. 37-9.   WAC bank account statements show the bank paid check 123 and did not disburse it as a direct deposit.   *See id.*

- WAC bank records show a collected bank balance on August 15, 2017, of $80,478.86 and a collected bank balance of $13,157.16 on August 21, 2017 (the date on or about Mr. Decker ceased performing services for WAC).   Ex. J to Stipulation, at 21, ECF Doc. No. 37-9.

- WAC bank records show:

    o Check 123 was paid in the amount of $16,000 on August 17, 2017.   Ex. J to Stipulation, at 19, ECF Doc. No. 37-9.

    o Check 124 was paid in the amount of $50,000 on August 17, 2017.   *Id.*

    o Check 125 was paid in the amount of $223.74 on October 31, 2017.   *Id.* at 24.

    o Check 126 was paid in the amount of $373.03 on January 17, 2018.   *Id.* at 30.

    o Check 127 was paid in the amount of $1,595.77 on February 1, 2018.   *Id.* at 32.

    o Check 128 was paid in the amount of $2,909.51 on February 1, 2018.   *Id.*

    o Check 129 was paid in the amount of $2,218 on February 21, 2018.   *Id.*

12

o  The bank records provided show no check numbers 130, 131, or 132 have been honored.

- WAC continued to receive payments after it ceased operations. From September 2017 through December 2017, WAC collected $22,695 in payments. Ex. I to Stipulation, at 1, ECF Doc. No. 37-8.

Essentially, the debtor operated as an accountant before and after he filed chapter 7 through a personal services corporation, WAC. The debtor was its sole shareholder until he filed his chapter 7 petition and his stock became property of the estate. The stock has not been exempted or abandoned from the estate. The debtor's accounting business generated income, from which it paid its operating expenses, including prepaying operating expenses immediately prior to Mr. Decker filing his chapter 7 petition.[7] The business had little to no unsecured debt and no delinquent debt. The business had excess revenues over its expenses and debt obligations. Nevertheless, Mr. Decker contends the value of his stock is worthless. *See* Ans. ¶ 30, ECF Doc. No. 27; Am. Sch. A/B, at 7, ECF Doc. No 4, Case No. 17-50297; Am. Sch. A/B, at 5, ECF Doc. No. 14, Case No. 17-50297. The business paid its operating expenses, paid salaries, and disbursed shareholder distributions before and after Mr. Decker filed his bankruptcy petition.

The material facts are those which will make a difference to the outcome. Neither party has pointed to any disagreement over any facts. Neither party has voiced any disagreement over which facts are material. Neither party has pointed to any evidence that indicates conflicting characterization of the facts. Neither party has explained how the facts may support differing outcomes. The parties seem to agree on all the facts and simply dispute the application of the law

---

7    Mr. Decker's debts are not primarily consumer debts. Nearly all of Mr. Decker's debts relate to his violation of a covenant not to complete with his former employer. *See* Am. Sch. E/F, ECF Doc. No. 1, Case No. 17-50297.

13

to the facts.   For these reasons, the parties suggest that the Court may grant judgment as a matter of law.

*The defendants' motion for summary judgment*

In their motion for summary judgment, the defendants acknowledge the initial inquiry is whether amounts transferred from WAC to the debtor constitute transfers of "proceeds, product, offspring, rents, or profits of or from property of the estate" or whether they are "earnings from services performed by an individual debtor after the commencement of the case" that are excepted from property of the estate under section 541(a)(6) of the Bankruptcy Code.   The defendants' answer is the latter.   According to the defendants, because Mr. Decker performed some services for the corporation postpetition, and because the corporation received income postpetition, all amounts transferred to Mr. Decker, whether salary or shareholder distributions, are "earnings from services performed by an individual after the commencement of the case" and are excepted from property of the estate.   In other words, the defendants assert the earnings exception excludes earnings regardless of whether the earnings are from services performed before the commencement of the case.

*Are shareholder distributions in a closely held personal services corporation always "earnings from services performed by an individual debtor after the commencement of the case"?*

According to Mr. Decker, because he is the sole shareholder of the accounting firm, and because he is the sole individual accountant performing the professional services at the firm, all income received by the accounting firm must be earnings from services performed by him and excluded from his personal bankruptcy case.   Mr. Decker makes no distinction between prepetition services and postpetition services, as if all income to the corporation is earnings from

14

services performed by him after the commencement of his bankruptcy case.

> *Bankruptcy Code section 541(a)(6) does not exclude earnings from services performed prior to the petition date.*

Bankruptcy Code section 541(a)(6) contains an exception from property of the estate for "proceeds, product, offspring, rents, or profits of or from property of the estate, except such as are earnings from services performed by an individual debtor after the commencement of the case." 11 U.S.C. § 541(a)(6).   Bankruptcy Code section 541(a)(6) does not contain an exception from property of the estate for proceeds, product, offspring, rents, or profits of or from property of the estate attributable to earnings from services performed by an individual debtor *before* the commencement of the case.   *Id.*; *see Jess v. Carey (In re Jess)*, 169 F.3d 1204, 1207 (9th Cir. 1999) (noting that the estate is entitled to recover payments received postpetition attributable to prepetition services); *In re Silva*, 556 B.R. 16, 22 (Bankr. D. Mass. 2016) (holding that the trustee may recover payments received postpetition for services rendered prepetition even when invoices generated postpetition); *see also Longaker v. Bos. Sci. Corp.*, 715 F.3d 658, 661–62 (8th Cir. 2013), *cert. denied*, 571 U.S. 991 (2013) (ruling that the earnings exception would not exclude postpetition payments on prepetition employment contract).   The earnings exception applies only to the extent the debtor performed the services postpetition; to the extent the earnings are attributable to something other than a debtor's performance postpetition, the earnings are not excluded.   *See FitzSimmons v. Walsh (In re FitzSimmons)*, 725 F.2d 1208, 1211 (9th Cir. 1984) (concluding that earnings attributable to invested capital, accounts receivable, good will, or employment contracts were not excluded under section 541(a)(6)); *Andrews v. Riggs Nat'l Bank of Wash., D.C. (In re Andrews)*, 80 F.3d 906, 909–10 (4th Cir. 1996) (explaining that only postpetition earnings "that result from the debtor's postpetition activities" are excluded and

proceeds that may flow from the debtor's prepetition activities are not excluded).

More to the point, the language of section 541(a)(6) reveals an obvious temporal limitation. The language "earnings from services performed . . . after the commencement of the case" has meaning. The Fourth Circuit instructs federal courts to "give effect to every word of a statute whenever possible." *Carroll v. Logan*, 735 F.3d 147, 152 (4th Cir. 2013). And as the Supreme Court reminds us, Congress "says in a statute what it means and means in a statute what it says there." *Virginia v. Webb (In re Webb)*, 908 F.3d 941, 946 (4th Cir. 2018) (quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank*, *N.A.*, 530 U.S. 1, 6 (2000)). For this Court to apply the exception contained in section 541(a)(6) to earnings from services performed before the commencement of the case, the Court would be ignoring the language of the Code (in particular, the Court would be ignoring what section 541(a)(6) says). Instead, the Court will apply the exception in the statute as it instructs: to earnings from services "performed by an individual debtor after the commencement of the case," not before.

This means section 541(a)(6) requires this Court to consider when the services which gave rise to the earnings were performed. *See Jess*, 169 F.3d at 1207 (noting that the estate is entitled to recover payments received postpetition attributable to prepetition services); *Rau v. Ryerson (In re Ryerson)*, 739 F.2d 1423, 1425 (9th Cir. 1984) (holding payments for prepetition services are not excluded from the estate simply because the payments were received postpetition and additional services were required to receive the payments). As described by the bankruptcy court for the Southern District of Texas, property of the estate includes profits of a service-oriented enterprise, except "*that portion* of the profits represented by the earnings from services performed by an individual debtor *after the commencement of the case* is not property of the estate." *In re*

16

*Molina Y Vedia*, 150 B.R. 393, 398 (Bankr. S.D. Tex. 1992) (emphasis added); *see Unsecured Creditors Comm. v. Prince (In re Prince)*, 127 B.R. 187, 192 (N.D. Ill. 1991) (limiting 541(a)(6) to actual services performed postpetition), *aff'd sub nom. In re Prince*, 85 F.3d 314 (7th Cir. 1996). This conclusion is consistent with the appellate rulings in *Fitzsimmons*.    The bankruptcy court ordered as a matter of law that Mr. Fitzsimmons's law practice earnings were property of the estate, whether generated by services performed before or after the petition.    The Bankruptcy Appellate Panel reversed that ruling "insofar as it holds that post-bankruptcy earnings from services performed by an individual debtor are property of the estate." *Fitzsimmons v. Walsh (In re Fitzsimmons)*, 20 B.R. 237, 240 (B.A.P. 9th Cir. 1982).    On appeal, the Ninth Circuit Court of Appeals agreed that earnings from services performed *postpetition* qualify for the exception under 541(a)(6) except to the extent such law practice earnings (even generated postpetition) are attributable to invested capital, accounts receivable, good will, employment contracts with the firm's staff, client relationships, fee agreements, or the like.    *FitzSimmons*, 725 F.2d at 1211–12 (affirming and remanding for a calculation of the amount of earnings of the law practice that are attributable to postpetition services personally performed by Mr. Fitzsimmons).

The defendants cite *Litzler v. Sholdra (In re Sholdra)*, 270 B.R. 64 (Bankr. N.D. Tex. 2001) as dispositive on the matters in this case.    Not so.    The defendants fail to recognize a key difference between Mr. Decker's case and *Sholdra*.    In *Sholdra*, the trustee sought to recover earnings that had been generated in the two calendar years following the petition.    Dr. Sholdra filed his petition in August 1998.    The trustee sought to recover amounts paid to Dr. Sholdra that had been earned in the years 1999 and 2000.    Dr. Sholdra's trustee was not seeking to recover amounts earned prior to August 1998.    When the court in *Sholdra* concluded the section 541(a)(6)

17

earnings exception applied, it was only considering personal service earnings from services performed in the calendar years after the debtor filed his petition. *See id.* at 270 B.R. at 66, 72.

> *Bankruptcy Code section 541(a)(6) does not exclude earnings from services performed prior to the petition date even if the services were performed by a shareholder of an S Corporation.*

Section 541 includes in a bankruptcy estate "proceeds, product, offspring, rents, or profits of or from property of the estate." 11 U.S.C. § 541(a)(6). That same section provides an exception for "earnings from services performed by an individual debtor after the commencement of the case." *Id.* Nothing in section 541(a)(6) expands the earnings exception beyond "services performed by an individual debtor after the commencement of the case" if the individual is a shareholder of a S Corporation. *See id.*

The existence of an S Corporation may permit corporate earnings to be taxed to the shareholder (and thus avoid the double taxation of taxing both the corporation and the shareholder who receives dividends) but its existence does not revise the language of section 541(a)(6). The Code does not exclude income from the estate simply because it may be reported as "personal earnings" on a tax return, if the income was not attributed to earnings from services performed after the debtor filed bankruptcy. In other words, what matters is the timing of the performance of the personal services which gave rise to the earnings. Whether earnings in an S Corporation may be taxed to the shareholder does not change when the services were performed. Either the earnings were from services performed after the commencement of the case or they were not. Merely because the debtor is a shareholder of an S Corporation does not change the timing of services rendered.

The defendants' response to the Trustee's Motion for Summary Judgment contains the

18

following quizzical paragraph as the sole basis for why a shareholder of an S Corporation may

exclude all earnings of an S Corporation under section 541(a)(6).

> The United States Bankruptcy Court for the Eastern District of Virginia in
> *In Re Health Diagnostic Lab, Inc. v. Arrowsmith*, thoroughly explained this
> proposition with respect to the status of subchapter S corporations under the
> Internal Revenue Code:
>
>> The "default" tax status for corporate entities in the United
>> States is a subchapter C corporation status ("C corporation
>> status"). *See* 26 U.S.C. § 1361. The tax laws of subchapter
>> C of Chapter 1, Title 26 of the Tax Code govern C
>> corporation taxation. C corporations are subject to two levels
>> of taxation, or "double taxation," whereby the corporation's
>> net income is taxed, and dividends to the shareholders are
>> taxed as well. In contrast to C corporation status, S
>> corporation status confers "pass-through taxation." S
>> corporations pass corporate income, losses, deductions, and
>> credits to their shareholders. In turn, ***shareholders of an S
>> corporation must report*** their respective attributable shares
>> of the ***income and losses of the S corporation on their
>> personal tax returns. See, e.g.***,. Emphasis added.
>
> 421 B.R. 552, 557 (Bankr. E.D. Va. 2017) (citing *Gitlitz v. Comm'r of
> Internal Revenue*, 531 U.S. 206, 209 (2001) (emphasis added).

Def.'s Resp. to Tr.'s Mot. for Summ. J., at 2–3, ECF Doc. No. 46.

It is unclear why this excerpt was cited in this manner.   The paragraph is not found within

the case at the citation indicated, 421 B.R. 552, or on the page listed in the citation indicated, 421

B.R. 552, 557.   The excerpt cannot be found in the case named in the citation.   The excerpt

appears in a separate opinion, *Arrowsmith v. United States (In re Health Diagnostic Laboratory,*

*Inc.)*, 578 B.R. 552, 557 (Bankr. E.D. Va. 2017).   All the same, based on the paragraph cited, it

appears the defendants suggest that because a shareholder of an S Corporation reports tax attributes

on a personal tax return all corporate earnings are transformed into postpetition personal service

19

earnings.[8]

As the Trustee points out, the Internal Revenue Code does not support the defendants'

characterization. The Internal Revenue Code section 1398 provides that if a shareholder of a S

Corporation files a bankruptcy petition, the bankruptcy estate of that shareholder acquires the tax

attributes. 26 U.S.C. § 1398. Nothing in the Internal Revenue Code changes the timing of the

performance of the services which give rise to the earnings, even if earnings were reported on a

tax return filed after the petition date. *See id.*; *see Medley v. Citizens S. BancShares, Inc. (In re*

*Medley)*, Adv. P. No. 15-01034, 2016 WL 3003642 (Bankr. M.D. Ala. May 17, 2016); *Williams*

*v. Comm'r.*, 123 T.C. 144 (2004).

The defendants have failed to provide authority for the assertion that reporting earnings of

an S Corporation on an individual shareholder's tax return renders the earnings excluded from

property of the estate if the earnings were generated out of services performed prior to the petition.

The defendants seek to characterize all shareholder distributions as excluded from the

estate on the theory that the corporate earnings (which yield the shareholder distributions and

profits) would be taxed to the shareholder. The defendants overlook section 1398 of the Internal

Revenue Code and the temporal language of section 541(a)(6) of the Bankruptcy Code. For

purposes of the earnings exception in this case, what matters is not the taxation of the earnings,

but the time period when the services were performed. *See* 11 U.S.C. § 541(a)(6).

> *The transfers the Trustee seeks to recover contain earnings from services performed prior*
> *to the commencement of the case.*

---

[8]     The defendants' insinuation that reporting income on a tax return renders the income excluded from the estate
cannot be reconciled with the language of section 541(a)(6) or how that Code section has been applied. *See, e.g., In*
*re Silva*, 556 B.R. 16, 20 (Bankr. D. Mass. 2016) (finding property of the estate included income received postpetition,
but earned prepetition); *Jess v. Carey (In re Jess)*, 169 F.3d 1204, 1207 (9th Cir. 1999) (same); *accord Parsons v.*
*Union Planters Bank (In re Parsons)*, 280 F.3d 1185, 1188 (8th Cir. 2002) (ruling that real estate commissions earned
prepetition but received postpetition are property of the estate).

The parties each describe the corporation as having generated income prior to the petition. No one denies that as of the petition date, the S Corporation had earnings. Certainly, WAC's retained earnings as of the petition date cannot be earnings from services performed after the petition date. It is clearly mistaken to characterize earnings in existence as of the petition date as having been generated after the petition date.

The parties agree WAC had cash on its general ledger and in its bank account as of the petition date. The cash in existence as of the petition date simply could not represent income from services performed by an individual after the petition date; to suggest otherwise is incongruous.

The defendants admit WAC had accounts receivable as of the petition date. In other words, WAC was owed income for services having already been performed. It is impossible to characterize the income from the accounts receivable as of the petition date as income from services performed after the petition date.

Nothing in the caselaw cited by the debtor, or the caselaw cited by the Trustee, or the caselaw discovered by the Court's research, or in the Code, or in the Rules, or in the stipulation, support the conclusion that retained earnings as of the petition date are earnings from services performed *after* the petition date, or cash as of the petition date is earnings from services performed *after* the petition date, or accounts receivable as of the petition date is for services performed *after* the petition date.

This Court holds that as a matter of law funds received by, or held by, WAC that are attributed to earnings from services performed prior to the commencement of the case and transferred to Mr. Decker or to Winchester Accounting after the petition, are not "earnings from services performed by an individual debtor after the commencement of the case."

21

*Were amounts transferred to Mr. Decker or Winchester Accounting from services performed prior to the petition date?*

Based on the exhibits, stipulation, and statements made in the pleadings, it is uncontested that amounts transferred to Mr. Decker and Winchester Accounting, Inc. after the petition include amounts from earnings for services performed prior to the petition.   The uncontested facts show that WAC reported on its general ledger WAC's retained earnings of $66,787 as of December 31, 2016.   Ex. A to Stipulation, at 4, ECF Doc. No. 37 (2016 tax return); *see also* Ex. K to Stipulation, at 2, 4, ECF Doc. No. 42-2.   Between January 1, 2017, and March 6, 2017, Mr. Decker withdrew shareholder distributions of $9,850 from retained earnings.   *See* Ex. K to Stipulation, at 4, ECF Doc. No. 42-2; Ex. M-1 to Stipulation, at 6–7, ECF Doc. No. 43; Ex. M-2 to Stipulation, at 14, ECF Doc. No. 43-1.   And so as of the petition date, WAC had in existence earnings of at least $56,937.   The retained earnings of $56,937 as of March 30, 2017, were not generated from services performed after the petition, and accordingly do not qualify for the earnings exception of section 541(a)(6).

The debtor admits WAC had accounts receivable of $47,055 as of the petition date.   These represent services performed prior to the petition.   *See* Ex. A to Mot. to Quash ¶ 14, ECF Doc. No. 61-1, Case No. 17-50297.

In addition, no one disputes that WAC purchased a new Ford truck in February 2017 shortly before Mr. Decker filed his chapter 7 bankruptcy petition in March 2017.   WAC reported the asset (a truck) and the liability (the loan for the truck) on its balance sheet.   WAC also, however, reported all of the tax-deductible depreciation for the truck ($61,708.48) as an offset to the retained earnings as of the petition date.   *Id*. at 3.   The depreciation reflects an allowance [9] for an

---

[9]        *See* 26 U.S.C. § 167.

accounting deduction but is not an out of pocket expense.   That is, neither WAC nor Mr. Decker expended, transferred, disbursed, or in any other way deducted actual cash or currency in the amount of $61,708.48 from the WAC bank account, nor used WAC earnings or WAC receivables to pay or expend $61,708.48 for loan repayment in 2017.   *See, e.g.*, Ex. J to Stipulation, ECF Doc. No. 37-9.   So, although the tax deduction for deprecation is disclosed as an expense to offset the retained earnings on the WAC general ledger, the actual earnings as of the petition date were not depleted by this figure (the bank statement did not disclose a corresponding debit of the claimed depreciation).

WAC's records show the retained earnings as negative $40,730.   Once the depreciation is credited to WAC's reported retained earnings, the result is a positive number.   This clearly shows that the retained earnings were available to pay shareholder dividends and that the stock had a value of at least the value of the retained earnings.

No one disputes that the WAC's bank account balance as of the petition date, March 30, 2017, was $1,064.69.   The general ledger showed a cash balance of $1,209.70 on that date.

The amounts earned prior to the petition and held by WAC as of the petition date ($56,937), plus accounts receivable ($47,055) and cash in the bank ($1,064.69) could not reasonably, or possibly, be attributed to services that had not yet been performed.   The evidence does not show otherwise.

Not only does the above show undoubtedly that earnings existed from services performed prior to the petition, but additional records show that services most likely occurred prior to the petition which resulted in income after the petition.   One day after the petition date, WAC made a deposit of $7,675 into its bank account.   In the seven days following the petition, WAC issued

23

49 invoices.   In the months of April 2017 and May 2017, WAC issued 138 invoices for $96,965. It is likely these invoices reflect some services performed prior to the petition, and as such, that income would not fall within the earning exception of 541(a)(6).

Putting all of this together, the evidence cannot support a finding that all amounts paid to the defendants had been earned after the petition date.

The Trustee seeks to recover from Mr. Decker and Winchester Accounting the transfers to them of the shareholder distributions as products, proceeds, offspring, or profits from the stock of WAC.   The debtor and Winchester Accounting contend any amounts they received were excluded under the earnings exception as a matter of law.   The debtor and Winchester Accounting are incorrect.   Section 541(a)(6) does not exclude from the estate shareholder distributions attributable to services performed prior to the petition date.   As a matter of law, shareholder distributions derived from earnings from services performed prior to the petition date are not excluded from the estate under section 541(a)(6), and the Trustee has standing to recover them.

*The stock in WAC is property of the estate.*

The parties agree that when Mr. Decker filed his bankruptcy petition, his stock in WAC became property of his bankruptcy estate.   Stipulation ¶ 3, ECF Doc. No. 33.   The stock is property of the estate, and as such the Trustee has right, title, and interest in the stock (and to any distributions to the stockholder), despite the debtor's charge that the Trustee has failed to take possession of the stock.   11 U.S.C. § 541; *see also Fitzsimmons*, 725 F.2d at 1211 (explaining that earnings attributable to firms' invested capital, accounts receivable, good will, fee agreements, and the like accrue to the estate).

Because the Trustee is the rightful owner of the stock in WAC, the Trustee may recover

the value of the stock.   *See* 11 U.S.C. § 704.

The debtor has suggested the value of his stock for purposes of his bankruptcy case should be determined by its liquidation value.   *See* Am. Sch. A/B, at 7, ECF Doc. No 4, Case No. 17-50297; Am. Sch. A/B, at 5, ECF Doc. No. 14, Case No. 17-50297.   In other words, the debtor admits that a comparison of the assets and liabilities determines if there is equity in the stock and such equity would reflect its value as of the petition date.   *See* Am. Sch. A/B, at 7, ECF Doc. No 4, Case No. 17-50297; Am. Sch. A/B, at 5, ECF Doc. No. 14, Case No. 17-50297.   Obviously, the equity in the stock could not reflect earnings from services performed *after* the petition date because as of that date, such services had not been performed.   Hence, the equity in the stock of the corporation as of the petition date is not excluded from property of the estate under the earnings exception.

The debtor reports that as of March 31, 2017, the assets of the corporation comprised current assets (bank balances, amounts due from clients, and amounts due from vendors) of $9,514.75; fixed assets (vehicle, furniture, and equipment) of $78,988.41; plus a security deposit of $1,700.   The assets total $90,203.16.[10]   Ex. K to Stipulation, at 3, ECF Doc. No. 42-2.   The debtor reports that as of this date WAC had current liabilities of $138.81 and long-term liabilities of $69,086.11 for a total amount of liabilities of $69,224.92.   *Id.* at 3–4.   Total assets minus total

---

[10]     The debtor reports a deduction for accumulated depreciation as an offset to the fixed assets.   The figure for accumulated depreciation is an allowance for a tax deduction and in this case does not reflect an actual out of pocket expense.   The debtor purchased a truck with WAC funds in February 2017 for $71,966.   He claimed a 100% depreciation expense as a tax deduction.   The depreciation deduction is an allowance not based on any actual expenditure made that year, and so for purposes of determining whether the funds paid to Mr. Decker or Winchester Accounting were from services performed after the commencement of the case, the allowance is immaterial:   it was not paid out of pocket and did not reduce the actual income from services performed prior to the petition.

liabilities equals $20,978.24.[11]   The debtor admitted that the value of his stock is the simple calculation of the comparison of the value of these assets minus the corporate debts, hence the stock has value.   This value could be deemed greater if the accounts receivable and pre-paid expenses are considered, even without consideration for any value for the good will or any value for Mr. Decker's continued services.   Despite the debtor's assertions that the stock is worthless because it has no "enterprise value" if Mr. Decker resigns from employment with WAC, the stock in WAC which became property of the estate on March 30, 2017, was not worthless.

The defendants allege the Trustee failed to "take possession" of the stock.   The defendants imply that the failure to "take possession" disqualifies the Trustee from the rights to the profits, proceeds, product, or dividends owing to the stockholder.   The defendants have failed to provide authority for their contention that although the stock is property of the estate, the chapter 7 trustee is not entitled to the profits, proceeds, product, and distributions owing to the shareholder of that stock simply because the Trustee did not physically hold the stock certificates at the time WAC disbursed these amounts to the debtor.   The defendants cite no authority for their insistence that the chapter 7 Trustee must take an affirmative step in order to have the right to property of the estate.   Furthermore, the Trustee not only has the right to the property but has an obligation to administer property of the estate.   11 U.S.C. § 704.   This is all the more reason why the Bankruptcy Code allows the Trustee to recover transfers of his interests in property of the estate to carry out his duty to liquidate property of the estate.   *See, e.g.*, 11 U.S.C. §§ 542, 548, 550, 704(a).   The Code provides consequences for a debtor who obstructs that process.   *See, e.g.*, 11 U.S.C. § 727(a), (d).   As such, this Court disagrees with the defendants' contention that the

---

[11]        WAC reported net income as negative $40,730.24 because WAC offset its assets by the 100% depreciation allowance.

Trustee has no standing to recover the transfers to Mr. Decker or Winchester Accounting.

The Trustee alleges that the debtor caused WAC to transfer to the debtor and Winchester Accounting the proceeds, product, offspring, or profits of the stock.   The debtor and Winchester Accounting insist as a matter of law the Trustee has no standing to recover these transfers on the ground that the proceeds, product, offspring, or profits were excluded as "earnings from personal services performed by an individual debtor after the petition."   As explained above, the debtor overstates the earnings exception and seeks to apply the exception to income from earnings from services performed prior to the petition date.

For all these reasons, the defendants' motion for summary judgment must be denied.

*The Trustee's Motion for Summary Judgment*

The Trustee describes in his motion for summary judgment transfers to Mr. Decker for shareholder distributions as well as profits of the stock in WAC.   The Trustee also describes transfers to Winchester Accounting of profits from the stock in WAC.   The Trustee contends the application of the law to the facts is disputed, but the facts and the evidence are not.   And so, the Trustee requests the Court consider the arguments, evidence, caselaw, and stipulation and enter judgment as a matter of law.

> *The debtor received shareholder distributions from services performed prior to the petition.*

For starters, the Trustee seeks to recover shareholder distributions that WAC made to Mr. Decker after the petition date.   In his complaint, the Trustee pleads WAC paid shareholder distributions of $32,500 to Mr. Decker postpetition.   In his motion for summary judgment and response to the defendants' motion for summary judgment, the Trustee enlarges the plea by showing that the uncontested evidence reveals postpetition shareholder distributions of at least

27

$45,000.   In addition, the Trustee pleads that Mr. Decker received a shareholder distribution of $50,000 that Mr. Decker later recharacterized as salary.   On top of that, the Trustee pleads that Mr. Decker received profits owing to the shareholder but which were reported as excess salary. The Trustee contends any amounts paid to Mr. Decker more than the amounts he disclosed as his salary, including the lump sum $50,000 distribution disguised as salary, are shareholder profits owing to the estate.   Finally, the Trustee asserts amounts paid after WAC closed on August 21, 2017, were transfers of the profits owing to the bankruptcy estate which holds the WAC stock.

In response, the defendants do not dispute the facts nor identify any facts that would make a difference to the outcome.   The defendants note that the question is not *whether* amounts were transferred to Mr. Decker as shareholder distributions or excess salary, but "whether amounts transferred from [WAC] to [Mr. Decker] in excess of his salary constitute transfers of 'proceeds, product, offspring, rents or profits of or from property of the estate' or whether they are 'earnings from services performed by an individual debtor after the commencement of the case.'"   Resp. to Tr.'s Mot. for Summ. J, at 2, ECF Doc. No. 46.   Mr. Decker admits the additional amounts received exceed the amounts he disclosed as his "regularly received" salary.   *Id.* at 11–12.   In his response to the Trustee's motion for summary judgment, Mr. Decker notes future shareholder distributions, which he admits may be characterized as either distributions or dividends in an S Corporation, are unknown until they are received.   *Id.* at 12.   He explains that "future shareholder distributions are not properly included as income that is 'regularly received' as contemplated by Schedule I," because a closely held corporation cannot know the extent of any profits it may realize.   *See id.*   Mr. Decker does not dispute the fact that he received distributions as a shareholder and received amounts in excess of his salary.

28

As the Court has explained above, the amounts transferred to Mr. Decker included amounts that were from earnings from services performed prior to the petition.   This means that the transfers to Mr. Decker included amounts that were not excluded from the estate.   This means that the Court may grant judgment to the Trustee as to the transfers of property of the estate. Therefore, the Court will consider the record to determine the amount of the judgment.   At this stage, not only have the defendants failed to identify the existence of any factual issue for trial, but the Trustee has identified uncontested facts and records which support his complaint.

The parties stipulate to the exhibits including the general ledger and the bank statements. Stipulation ¶¶ 17, 21, ECF Doc. No. 33; *see* Ex. J to Stipulation, ECF Doc. No. 37-9; Ex. M-1 to Stipulation, ECF Doc. No. 43; Ex. M-2 to Stipulation, ECF Doc. No. 43-1.   The general ledger and the bank statements support the Trustee's allegations and show the following transfers of shareholder distributions after the petition:

| June 28, 2017 | $12,500 |
| July 7, 2017 | $1,000 |
| July 16, 2017 | $3,500 |
| August 12, 2017 | $10,000 |
| August 25, 2017 | $2,000 |
| October 2, 2017 | $1,500 |
| October 13, 2017 | $2,000 |

Ex. M-1 to Stipulation, at 10–13, ECF Doc. No. 43; Ex. M-2 to Stipulation, at 14–15, ECF Doc. No. 43-1; Ex. J to Stipulation, ECF Doc. No. 37-9 (showing the above transfers from the WAC bank account to the personal bank account of Mr. Decker as direct deposit transactions).   The total

of these distributions is $32,500.   In addition to the above, the general ledger reflects a shareholder

distribution on August 15, 2017, that is recorded as "VOID" but then records, for the same day, a

check to Mr. Decker of $16,000.   Ex. M-1 to Stipulation, at 11, ECF Doc. No. 43; Ex. M-2 to

Stipulation, at 14, ECF Doc. No. 43-1.   The bank records reflect the check (number 123 in the

amount of $16,000) was honored on August 17, 2017.   Ex. J to Stipulation, at 19, ECF Doc. No.

37-9.

The general ledger shows check number 124 in the amount of $50,000 issued to Mr. Decker

on August 15, 2017.   Ex. M-1 to Stipulation, at 11, ECF Doc. No. 43.   The check was honored

on August 17, 2017.   Ex. J to Stipulation, at 19, ECF Doc. No. 37-9.

The general ledger reflects certain credits and offsets to the WAC shareholder distributions

after Mr. Decker created his new entity and after August 21, 2017, when he ceased preparing tax

returns and providing public accounting services for WAC.   *See* Stipulation ¶ 6, ECF Doc. No.

33; Ex. M-1 to Stipulation, at 12–14, ECF Doc. No. 43; Ex. M-2 to Stipulation, at 14–15, ECF

Doc. No. 43-1.   The general ledger and balance sheet show $40,850 in shareholder distributions

for 2017 as of the end of October 2017.   Ex. K to Stipulation, at 6, ECF Doc. No. 42-2; Ex. M-2

to Stipulation, at 14–15, ECF Doc. No. 43-1.   After offsets and adjustments, the general ledger

reports an ending balance of $27,344.64 for shareholder distributions.   Ex. M-2 to Stipulation, at

15, ECF Doc. No. 43-1.   All of this shows that Mr. Decker does not deny that WAC disbursed

shareholder distributions after the petition date.   The fact that after he created a new entity, he

made offsetting entries to his ledger and made some transfers to WAC of certain amounts does not

change the fact that Mr. Decker was paid shareholder distributions at a time when the stock was

property of the estate, those shareholder distributions are property of the estate, and those amounts

30

must be repaid to the estate, not to WAC.

In addition to the reports acknowledging the WAC shareholder distributions to Mr. Decker postpetition, WAC's records show check number 123 with the date August 15, 2017, in the amount of $16,000, to Mr. Decker.   Ex. M-1 to Stipulation, at 11, ECF Doc. No. 43.   The ledger reports a check issued on August 15, 2017, as VOID under the category Shareholder Distribution and subsequently records a "paycheck" dated August 15, 2017.   Ex. M-1 to Stipulation, at 11, ECF Doc. No. 43; Ex. M-2 to Stipulation, at 14, ECF Doc. No. 43-1.   The debtor reports varying entries for the date August 15, 2017, and varying entries for check 123.   For example, the general ledger reports check 123 as broken down into:   $3,060 for payroll taxes, $1,160 Medicare withholding, $4,960 social security withholding, $2,500 Virginia withholding, $1,200 "Payroll Liabilities - Other," $40,000 to Michael Decker for officer salary, and $1,200 for retirement contributions. Ex. M-1 to Stipulation, at 26, ECF Doc. No. 43; Ex. M-2 to Stipulation, at 1, 4, 6–7, 9, 13, 20, 22– 25, ECF Doc. No. 43-1.   These amounts recorded for check 123 on the ledger equal $54,080. The ledger also reports check 123 on page 11 of the general ledger as paid "direct deposit" $16,000 on behalf of Michael Decker, not the $40,000 reported elsewhere in the ledger.   Ex. M-1 to Stipulation, at 11, ECF Doc. No. 43.   The general ledger shows "direct deposit" on August 15, 2017, to Michael Decker of $16,000 on page 11 of Exhibit M-1 yet fails to include this amount in direct deposit liabilities on August 15, 2017, on page 21 of the same exhibit.   *See* Ex. M-1 to Stipulation, at 11, 21, ECF Doc. No. 43.

The general ledger shows additional amounts paid to Mr. Decker on August 15, 2017.   For example, the ledger reports check 124 in the amount of $50,000 to Mr. Decker on August 15, 2017, and shows direct deposit amounts from the payroll account of $2,847.50 to Mr. Decker on August

31

15, 2017.   Ex. M-1 to Stipulation, at 11, 21, ECF Doc. No. 43, Ex. M-2 to Stipulation, at 13, ECF Doc. No. 43-1.

The general ledger reports a $40,000 payment as total officer salary paid to Michael Decker on August 15, 2017.   Ex. M-2 to Stipulation, at 20, ECF Doc. No. 43-1.   The payroll salary report is inconsistent with entries in the general ledger and does not fully account for the $50,000 (which on page 13 of Exhibit M-2 appears as "check" to Mr. Decker under "Payroll Liabilities – Other" category) plus the $40,000 (as a "paycheck" under "Officer Salary" on page 20 of Exhibit M-2), or the $16,000 (on page 11 of Exhibit M-1), or the payroll distributions made to Mr. Decker on August 15, 2017, and August 31, 2017 (appearing on page 21 of Exhibit M-1 also recorded as paychecks to Mr. Decker in August 2017).

The bank records show that on August 17, 2017, check 123 was paid in the amount of $16,000 and check 124 was paid in the amount of $50,000.   Ex. J to Stipulation, at 19, ECF Doc. No. 37-9.

The WAC payroll summary fails to report check 123 and check 124 paid on August 17, 2017, as officer salary in August 2017.   The general ledger entries recorded as "officer salary" for August 15, 2017, do not match the total amounts paid to Mr. Decker at various entries for the August 15, 2017, disbursements.   The WAC payroll summary reports $50,000 as the total officer salary paid in August 2017.   *See* Ex. D to Stipulation, at 7, ECF Doc. No. 42.   At the end of the day, the stipulation and exhibits show no reasonable dispute that $32,500 plus $16,000 and $50,000 was transferred after the petition to Mr. Decker.   Of these amounts, the Trustee asserts that each are shareholder distributions, and that the $50,000 payment was characterized as salary only after it was paid as a shareholder distribution.

Based on the foregoing, and in particular the admissions by the debtor, the Court finds no reasonable dispute that the transfers of $32,500 and $16,000 ($48,500 total) were shareholder distributions transferred after the petition date to Mr. Decker.   As explained earlier, there is no dispute that WAC had earnings from services performed prior to the petition from which to disburse the shareholder dividends.   The evidence, based on the stipulation and agreed exhibits, shows that as of the petition date, at least $56,937 were earnings in existence plus cash in the bank of $1,064.69 and accounts receivable of $47,055.   Indeed, $7,675 was deposited one day after the petition, and in the months after that the corporation received deposits in excess of billings, showing that accounts receivable were collected after the petition.   All of this shows no reasonable dispute that the shareholder distributions of $48,500 are "proceeds, product, offspring, rents, or profits" of the stock and as such are property of the estate under section 541(a)(6) and not excluded from the estate as earnings from services performed after the commencement of the case.

The Trustee is entitled to judgment as a matter of law in the amount of $48,500 for recovery of these shareholder distributions.

### The amounts paid in excess of salary and amounts paid for payroll taxes

The Trustee asserts that profits owed to the shareholder were transferred to Mr. Decker after the petition and disguised as salary.   The Trustee notes two ways in which the profits owing to the shareholder were transferred to Mr. Decker and disguised as salary.   One was through a lump sum shareholder distribution in the amount of $50,000 that was later recharacterized as salary.   A second was through amounts labeled as salary which exceed what Mr. Decker disclosed in his bankruptcy schedules as his salary.

Mr. Decker emphasizes that he was the sole shareholder of his accounting services S

33

Corporation until he filed bankruptcy and the chapter 7 trustee acquired the stock ownership. Prior to filing bankruptcy, as an S Corporation shareholder, Mr. Decker received a regular salary and periodic shareholder distributions. After filing his chapter 7 bankruptcy, Mr. Decker continued to receive regular salary and periodic shareholder disbursements. The WAC bank statements show payroll disbursements (to a payroll account) consistent with the general ledger and payroll summary report until August 2017. The WAC general ledger reports for August and September 2017 do not match the bank statements and payroll summary reports for those months. The Trustee asserts that certain amounts disbursed after the petition and labeled as Mr. Decker's salary were in fact shareholder distributions owed to the estate.

The defendants contend the amounts the Trustee seeks to recover are excluded as earnings from services performed by an individual debtor after the commencement of the case, even if they are "excess salary." The defendants note that because the Trustee failed to take physical possession of the stock, the debtor, as an employee and officer of WAC, was free to issue disbursements from WAC whether characterized as "salary" or "shareholder distributions." Def.'s Mem. In Support of Mot. for Summ. J., at 23–24, ECF Doc. No. 45-1.

> *Is the excess salary excluded from the estate as earnings from services performed by an individual debtor after the petition?*

The Trustee maintains that amounts paid to Mr. Decker in excess of the salary he disclosed in this bankruptcy case are proceeds, product, offspring, or profits of the stock and thus property of the estate. The Trustee notes the disclosures Mr. Decker made under penalty of perjury in his bankruptcy schedules and other sworn statements made in connection with the bankruptcy case in which he disclosed gross salary of $7,500 per month. In this way, Mr. Decker reported to the Court his salary would be $37,500 for the five months between April 2017 and August 2017 when

34

Mr. Decker was working for WAC. The Trustee notes that the bankruptcy schedules are consistent with the general ledger and prior tax returns until around August 2017 (when the Court instructed Mr. Decker to confer with the Trustee before withdrawing funds from the corporate bank account because the Court was considering the motion to sell the stock of the corporation). Then, the Trustee explains, in August 2017, Mr. Decker apparently caused WAC to pay to him large lump sum amounts. The Trustee identifies all amounts transferred to Mr. Decker in excess of his reported salary (which he explains as all amounts in excess of $37,500 for the period after March 30, 2017) and seeks recovery of these amounts as the proceeds, product, or profit of the corporate stock. The Trustee also alleges the amounts transferred on Mr. Decker's behalf for withholding taxes include the proceeds, product, and profits of estate property and as such may be recovered by the estate.

The defendants do not deny the transfers. Instead the defendants insist the amounts transferred are not property of the estate because they are all from services performed after the petition. As described above, the defendants cannot dispute that the amounts paid to Mr. Decker include earnings from services performed prior to the petition date. It is undisputed that $56,937 retained earnings plus $1,064.69 cash in the bank and $47,055 accounts receivable are amounts from services performed prior to the petition date. The earnings exception is inapplicable to these amounts ($56,937 + $1,064.69 + $47,055), which total $105,056.69.

Although the earnings exception does not apply to the amounts attributable to services performed prior to the commencement of the bankruptcy case, it does apply to the earnings from the services performed by Mr. Decker after the petition. Mr. Decker performed services postpetition, and to the extent that WAC earnings are attributable to his personal services work

35

performed postpetition and not to any services performed prepetition, based on the earnings exception, these earnings would not qualify as proceeds, product, and profits of the stock in WAC. *See* 11 U.S.C. § 541(a)(6).   The parties agree that Mr. Decker provided accounting services for WAC after the petition date until August 21, 2017.   The Trustee argues that income for the services performed postpetition is only in part from the personal services of Mr. Decker and in part from WAC as an entity.   The Trustee is correct that Mr. Decker's services were performed through WAC.   Undoubtedly, Mr. Decker's use of WAC's assets facilitated the services which then resulted in income.   Yet, the Trustee has not identified the evidence in the record which shows how much the WAC assets rendered income and how much Mr. Decker's services rendered income.

To be clear, the fact that WAC received income after the petition, and that Mr. Decker performed services after the petition, does not render all the income received excluded under the earnings exception.   As explained (repeatedly) in the many paragraphs above, the earnings in existence as of the petition date, cash as of the petition date, and accounts receivable as of the petition date are not earnings from services performed by Mr. Decker after the petition date.   To the extent these amounts were disbursed as shareholder distributions, the Trustee has standing to recover them in this case.

*The lump sum payment of $50,000 in August 2017.*

The Trustee describes a lump sum distribution of $50,000 as a shareholder distribution recharacterized as salary.   To determine whether to grant judgment as a matter of law on this allegation, the Court will review the evidence in the record on this matter.

- On or about August 21, 2017, Mr. Decker ceased preparing tax returns

36

and providing public accounting services for WAC.   Stipulation ¶ 6, ECF Doc. No. 33.   WAC thus also stopped operating on August 21, 2017.

- The bank records show that for each month in 2017, amounts disbursed for salaries were made through a payroll account.   Ex. J to Stipulation, at 1–29, ECF Doc. No. 37-9.

- The general ledger shows disbursements on August 15, 2017, to Mr. Decker for his net paycheck in the amount of $2,847.50 and Brittany Young in the amount of $1,270.22; likewise, the general ledger reflects on August 31, 2017, disbursement of the paycheck to Mr. Decker of $2,847.50 and Brittany Young of $1,270.22.   Ex. M-1 to Stipulation, at 21, ECF Doc. No. 43.   The total of these payroll disbursements to Mr. Decker in August 2017 is $5,695.   The bank statement shows a transfer to payroll for August 14, 2017, of $4,121.21, the combined amount for both Mr. Decker's and Ms. Young's August 15 paycheck plus a $3.50 fee for Quickbooks Payroll.   *See* Ex. J to Stipulation, at 20, ECF Doc. No. 37-9; Ex. M-1 to Stipulation, at 21, ECF Doc. No. 43.   The bank statement shows amounts transferred to payroll on August 30, 2017, of $1,271.97 and $2,849.25.   Ex. J to Stipulation, at 20, ECF Doc. No. 37-9.   The amounts deducted from the SunTrust bank account are the paycheck amount plus a $1.75 per paycheck fee paid to QuickBooks Payroll.   *See* Ex. M-2 to Stipulation, at 21, ECF Doc. No. 43-1.

37

- The payroll summary report fails to report in the August payroll summary the above amounts ($5,695) paid as salary to Mr. Decker in August 2017, nor does the payroll summary report these amount as having been paid to any other employee. Instead the payroll summary reports the amount of $50,000 as total officer salary to Mr. Decker in August 2017, and $3,625 as total non-officer salary. Ex. D to Stipulation, at 7, ECF Doc. No. 42.

- The bank records show that on August 17, 2017, check number 124 in the amount of $50,000 was honored. Ex. J to Stipulation, at 19, ECF Doc. No. 37-9. This check was not made through the payroll account. *See id.* at 19–20.

- The general ledger detail does not label check 124 to Mr. Decker as a paycheck.

- The general ledger records the check (not labeled "paycheck" or "liability check") under the category "payroll liabilities." Ex. M-1 to Stipulation, at 11, ECF Doc. No. 43. It is the only item appearing in that category not recorded as a "paycheck" or a "liability check." Indeed, it does not appear in the "payroll liabilities" section of the general ledger. *See id.* at 21–24.

- The general ledger does not associate check 124 with any payroll tax payments.

- The payroll summary reports in September 2017, at a time when Mr.

Decker was no longer an employee of WAC, payment of salary to him of $57,750 plus a credit against this officer salary of $50,000 labeled as "employee advance."   Ex. D to Stipulation, at 7, ECF Doc. No. 42.

- The bank statements do not show the payment of salary of $57,750 in September 2017.   Ex. J to Stipulation, at 22–23, ECF Doc. No. 37-9.

- The bank statements and general ledger do not show any employee advance of $50,000 for which an "employee advance" credit would apply.

- WAC no longer had employees in September 2017 at the time when the payroll summary reports an employee advance credit.

- After WAC ceased operating in August 2017, it disbursed salary and shareholder distributions to Mr. Decker through at least the end of December 2017.   Ex. J to Stipulation, at 20–29, ECF Doc. No. 37-9; Ex. M-1 to Stipulation, at 12–14, 21, ECF Doc. No. 43.

- WAC had as of the petition date retained earnings of $56,937, plus accounts receivable of $47,055, and cash in the bank account of $1,064.69.

- The tax return for WAC shows officer salary of $161,000 for 2017.   Ex. B to Stipulation, at 1, ECF Doc. No. 37-1.

- On July 24, 2017, the Trustee filed a motion seeking Court permission to sell the WAC stock to a prospective purchaser and noticed the matter for hearing on August 16, 2017.   *See* Mot., ECF Doc. No. 22, Case No.

39

17-50297.

- On August 15, 2017, the day before the scheduled hearing, WAC issued two checks to Mr. Decker:   one in the amount of $16,000 and the other in the amount of $50,000.   Ex. M-1 to Stipulation, at 11, ECF Doc. No. 43.

- Neither check dated August 15, 2017, was made through the payroll account.

- WAC paid tax payments to the United States Treasury for federal withholding through "e-pay" except for amounts recorded as having been paid for federal withholding on August 17, 2017.   *See* Ex. M-1 to Stipulation, at 22–23, ECF Doc. No. 43.

- The general ledger assigned check 126 as officer salary paid in September 2017 in the amount of $55,000 when Mr. Decker was not employed by WAC.   Ex. M-2 to Stipulation, at 20, ECF Doc. No. 43-1.

- The bank statements show check 126 was honored on January 17, 2018, in the amount of $373.03, not the $55,000 reported on the general ledger and recorded as paid on September 30, 2017.   Ex. J to Stipulation, at 30, ECF Doc. No. 37-9; *see* Ex. M-2 to Stipulation, at 20, ECF Doc. No. 43-1.

- Check 126 was not issued through the payroll account.

- The general ledger reports check 132 in the amount of $500 for Mr. Decker's salary issued on December 31, 2017, a time when he was not

40

employed by WAC.  *See* Ex. M-2 to Stipulation, at 14, 21, ECF Doc.
No. 43-1.  The bank statement records through August 2018, which is
the latest monthly bank account statement that has been filed with the
Court, do not show check 132 having been honored.

- Mr. Decker certified under penalty of perjury his salary from WAC was
  $7,500 per month.  *See* Sch. I, ECF Doc. No. 1, Case No. 17-50297.

Putting the above together, there is no reasonable dispute that WAC had earnings from services performed prior to the bankruptcy petition from which shareholder distributions were paid to Mr. Decker and not the Trustee.   At the time when the Trustee sought court authority to sell the stock of the corporation, Mr. Decker caused two irregular lump sum payments to be issued to him: one in the amount of $16,000 and the other in the amount of $50,000.   The payments of the lump sum amounts were not recorded or processed in a manner consistent with WAC's payment of salary to Mr. Decker up until this point.   At the time the two lump sum amounts were paid to Mr. Decker, WAC records show that WAC had earnings from services performed prior to the petition from which to issue shareholder distributions.   As described earlier in this opinion, the Court finds that the payment of the $16,000 lump sum amount in August 2017 is a shareholder distribution and that earnings from services performed prior to the petition were sufficient to pay such shareholder distribution.

The Trustee contends the $50,000 paid to Mr. Decker in August 2017 was a shareholder distribution, and Mr. Decker altered the WAC records to recharacterize the payment as salary. Mr. Decker acknowledges his "regularly received" salary would not include such amount.   Def.'s Resp. to Tr.'s Mot. for Summ. J., at 2–3, ECF Doc. No. 46 (admitting schedule I shows regularly

received salary and describing the inquiry as whether excess salary is excluded from the estate under section 541(a)(6)).

The support in the record which shows the disbursement of the $50,000 payment as salary is:   1) the stipulation asserting the officer salary is reported on the WAC payroll summary report prepared by Mr. Decker; 2) the payroll summary report shows $50,000 total salary paid to Mr. Decker in August 2017; and 3) the general ledger records the $50,000 paid in August as a payroll liability.

On the other hand, the support in the record which shows that the $50,000 disbursement is a shareholder distribution and was not salary when issued is: 1) WAC ceased providing tax accounting services on or about August 21, 2017, days after payment of the $50,000 lump sum to Mr. Decker; 2) WAC did not pay the $50,000 lump sum through its payroll account; 3) WAC had earnings from services performed before the petition from which to disburse the $50,000 lump sum; 4) Mr. Decker ceased working for WAC days after receipt of the lump sum disbursement; 5) the bank records reflect salary disbursements to Mr. Decker of $5,705 in August; 6) the payroll summary report does not reflect the $5,705 disbursed to Mr. Decker from the payroll account in August 2017; 7) the bank statement reflects regular salary disbursed to Mr. Decker in September 2017 after Mr. Decker was no longer an employee of WAC and when WAC was no longer operating; 8) the general ledger reflects amounts disbursed as salary to Mr. Decker in September 2017 greater than appear on the bank statements; 9) Mr. Decker reported on his bankruptcy schedules salary income of $7,500 per month; 10) Mr. Decker reported on his Statement of Financial Affairs separate amounts for his salary distinct from earnings from the business income; 11) the bank statement shows check 124 was paid in the amount of $50,000 on August 17, 2017;

12) the general ledger reports officer salary for August 15, 2017, in varying amounts;[12] 13) the bank statement reports check 123 was paid in the amount of $16,000 on August 17, 2017; 14) the bank statement fails to show transfers to the payroll account in amounts sufficient to account for the direct deposit amounts reported to Mr. Decker on August 15, 2017; and 15) the general ledger records check 123 and check 124 as direct deposit transactions but the bank statement fails to show either of these direct deposit transaction.

Considering the above, the Court concludes the evidence is sufficiently one-sided in support of the Trustee's claim that the disbursement of $50,000 to Mr. Decker on August 17, 2017, was a shareholder distribution and later relabeled or recharacterized as salary. Because of the internal inconsistences in the amounts reported as officer salary, the failure to fully account for the amounts labeled as officer salary in August 2017, and the failure to disburse the salary through the payroll account, even providing reasonable inferences to the non-moving party, the record does not show that a juror could reasonably conclude the lump sum payment of $50,000 to Mr. Decker in August 2017 was salary at the time it was disbursed.

*Amounts transferred to Winchester Accounting*

While the defendants do not contest that Mr. Decker caused WAC to transfer assets (including payments) to Winchester Accounting, the record fails to show that the amounts transferred to Winchester Accounting were in fact shareholder distributions or dividends on the stock. The stock of WAC is property of the estate and the shareholder distributions (or dividends)

---

[12] For example, page 11 of Exhibit M-1 shows check 123 as direct deposit to Michael Decker of $16,000 as paycheck on August 15, 2017. Ex. M-1 to Stipulation, at 11, ECF Doc. No. 43. The same exhibit on page 21 shows payroll direct deposit to Michael Decker of $2,847.50 as paycheck on August 15, 2017. *Id.* at 21. Exhibit M-2 on page 20 shows a payroll direct deposit of $5,000 to Michael Decker on August 15, 2017, as officer salary and also check 123 as direct deposit to Michael Decker of $40,000 as officer salary on August 15, 2017. Ex. M-2 to Stipulation, at 20, ECF Doc. No. 43-1.

paid to Mr. Decker or Winchester Accounting may be recovered.   The Court finds that amounts described above were disbursed to Mr. Decker as shareholder distributions but is not able to determine from the record that amounts paid to Winchester Accounting were shareholder distributions.

## CONCLUSION

The uncontested facts and records reflect that at least $56,937 plus $47,055 plus $1,064.69 were earnings from services prior to the petition.   As described herein, the amounts attributable to retained earnings, accounts receivable, and cash as of the petition date are not excluded under section 541(a)(6).   *Fitzsimmons*, 725 F.2d. at 1211 (earnings attributable to invested capital, accounts receivable, good will, or employment contracts are not excluded under section 541(a)(6)). When the stock is property of the estate, and the corporation has earnings from services prior to the petition, the postpetition disbursements of shareholder distributions or dividends are property of the estate under section 541(a)(6) and may be recovered by the Trustee.   In this case, the evidence shows that amounts attributable to services performed prior to the petition were paid to Mr. Decker postpetition as shareholder distributions.

The Court holds the amounts transferred as shareholder distributions are profits of the stock and are property of the estate which the Trustee may recover.

The defendants contend that the Trustee may not recover any amounts because the amounts transferred to Mr. Decker or Winchester Accounting were earnings from services performed after the petition.   As shown above, at least $105,056.69 is not attributable to earnings from services performed after the petition, the amount of $48,500 was disbursed as shareholder distributions, and the amount of $50,000 was a shareholder distribution when it was made and was later

44

recharacterized as salary.   These distributions ($48,500 plus $50,000) are property of the estate and may be recovered by the Trustee.   The Court holds as a matter of law that shareholder distributions were made in the amount of $98,500 after the petition date and these distributions were not made from earnings from services performed by an individual debtor after the petition.

Based on the foregoing, the Trustee is entitled to judgment as a matter of law as to $98,500 transferred to Mr. Decker.

The Court will issue an order consistent with this Memorandum Opinion.

Copies of this Memorandum Opinion are directed to be sent to counsel for the parties.